### AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Petitioner

v.

### FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Southwestern Bell Telephone Company, GTE Service Corporation, Ameritech Operating Company, Puerto Rico Telephone Company, Communications Satellite Corporation, Continental Telecom Inc., New York Telephone and New England Telephone Company, BellSouth Corporation, Bell Atlantic Telephone Companies, United Telephone System, Inc., Mountain States Telephone Company, et al., Pacific Bell, et al., Intervenors.

Nos. 85–1778, 85–1805, 85–1807, 86–1216, 86–1234, 86–1255, 86–1322 to 86–1324 and 87–1025.

United States Court of Appeals, District of Columbia Circuit.

Argued May 21, 1987.

Decided Jan. 22, 1988.

Michael Boudin, Washington, D.C., with whom Saul Fisher and Martin J. Silverman, White Plains, N.Y., for NYNEX Companies, petitioners in Nos. 85–1805, 85–1807 and 86–1216, and intervenors in Nos. 85–1778, 86–1234, 86–1255, 86–1322, 86–1323, 86–1324 and 87–1025.

Raymond F. Scully, Alan B. Sternstein, Katherine I. Hall, Washington, D.C., and Robert L. Barada, Los Angeles, Cal., for Pacific Bell, et al., petitioners in Nos. 85–1807 and 86–1323, and intervenors in Nos. 85–1778, 85–1805, 86–1216, 86–1234, 86–1255, 86–1322, 86–1324 and 87–1025.

William R. Malone, Richard McKenna and James R. Hobson, Washington, D.C., for GTE Services, et al., petitioners in No. 86–1234 and intervenors in Nos. 85–1778, 85–1805, 85–1807, 86–1216, 86–1255, 86–1322, 86–1323, 86–1324 and 87–1025.

R. Frost Branon, Jr., Atlanta, Ga., for BellSouth Corp., et al., petitioners in Nos. 85–1807 and 86–1322.

William C. Sullivan, Keith E. Davis, Linda S. Legg, St. Louis, Mo., Gary Buckwalter for Southwestern Bell, intervenors in Nos. 85–1778, 85–1805, 85–1807, 86–1216, 86–1234, 86–1255, 86–1322, 86–1323, 86–1324 and 87–1025.

Robert B. McKenna and Dana Rasmussen, Washington, D.C., for Mountain States Telephone, et al., petitioners in No. 86–1324 and intervenors in Nos. 85–1778, 85–1805, 85–1807, 86–1216, 86–1234, 86–1255, 86–1322 and 86–1323.

Mark J. Mathis and David K. Hall, Washington, D.C., for Bell Atlantic Telephone Companies, intervenors in Nos. 85–1778, 85–1805, 85–1807, 86–1216, 86–1234, 86–1322, 86–1323, 86–1324 and 87–1025.

Sally Katzen and John S. Hannon, Jr., Washington, D.C., for ComSat, intervenor in Nos. 85–1778 and 85–1807.

Ellen S. Deutsch, Washington, D.C., for Waitsfield Fayston Telephone Co., intervenor in Nos. 85–1805 and 86–1324.

Alfred Winchell Whittaker, Washington, D.C., for Ameritech Operating Companies, intervenors in Nos. 85–1778, 85–1805, 85–1807, 86–1216, 86–1234, 86–1255, 86–1322, 86–1323, 86–1324 and 87–1025 were on the joint brief, for petitioners and intervenors. John B. Messenger also entered an appearance for petitioner/intervenor NYNEX Companies. Gail L. Polivy, Washington, D.C., also entered an appearance for petitioner/intervenor GTE Corp.

Hope E. Thurrott, Paul G. Lane and Liam Coonan, St. Louis, Mo., also entered appearances, for petitioner/intervenor Southwestern Bell Telephone Co.

Thomas J. Reiman, Chicago, Ill., also entered an appearance, for intervenor Ameritech Operating Companies.

Lawrence W. Katz, Richard C. Schramm, Robert A. Levetown and E. Edward Bruce, Washington, D.C., also entered appearances, for petitioners/intervenors Bell Atlantic Telephone Companies, et al.

Vincent L. Sgrosso, Atlanta, Ga., also entered an appearance, for petitioner/intervenor BellSouth Corp.

Stanley J. Moore and Susan E. Barisone, San Francisco, Cal., also entered appearances, for petitioners/intervenors Pacific Bell, et al.

David D. Hiller of the Bar of the Supreme Court of Illinois, pro hac vice by special leave of Court, with whom Jules M. Perlberg and C. John Buresh, Chicago, Ill., were on the brief, for American Telephone and Telegraph Co., petitioner in Nos. 85–1778, 86–1225 and 87–1025, and intervenor in Nos. 85–1805, 85–1807, 86–1216, 86–1234, 86–1322, 86–1323 and 86–1324.

Jonathan S. Hoak, Chicago, Ill., and David J. Lewis, Washington, D.C., also entered appearances, for petitioner/intervenor American Tel. & Tel. Co.

John E. Ingle, Counsel, F.C.C., with whom Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel and Laurel R. Bergold, Counsel,

F.C.C., Robert B. Nicholson and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Brian R. Moir, Washington, D.C., also entered an appearance, for intervenor, Intern. Communications Ass'n.

Carolyn C. Hill and James T. Roche, Washington, D.C., also entered appearances, for intervenor, United Telephone System.

John C. Wohlstetter, Washington, D.C., also entered an appearance, for intervenor, Continental Telecom, Inc.

Thomas J. O'Reilly, Washington, D.C., also entered an appearance, for intervenor, United States Telephone Ass'n.

Paul J. Berman, Washington, D.C., also entered an appearance, for intervenor, Puerto Rico Telephone Co.

Theodore D. Frank, Washington, D.C., also entered an appearance, for intervenor, Centel Corp.

Joseph M. Kittner, Albert J. Catalano and James S. Blaszak, Washington, D.C., also entered appearances for intervenor, Ad Hoc Telecommunications Users Committee.

John L. Bartlett and Robert J. Butler, Washington, D.C., entered appearances for intervenor Aeronautical Radio, Inc.

David Cosson, Washington, D.C., also entered an appearance for intervenors, Nat. Telephone Co-op Ass'n, et al.

Arthur H. Simms, Washington, D.C., also entered an appearance, for intervenor, Western Union Telegraph Co.

Before MIKVA, BORK and STARR, Circuit Judges.

Opinion PER CURIAM.

Concurring opinion filed by Circuit Judge STARR.

PER CURIAM:

Petitioners, numerous telephone companies and other carriers of telecommunications service, challenge the adoption of a rule by the Federal Communications Commission (the "Commission") that requires the carriers to refund earnings they receive in excess of the expected rate of return on capital factored into their rates. Petitioners claim that the refund rule is arbitrary and capricious, exceeds the Commission's statutory authority, and is an unconstitutional confiscation of their property. We agree that the refund rule is arbitrary and capricious and grant the petitions for review.

**I.**

Under the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151–611 (1982 & Supp. III 1985)) (the "Act"), the Commission regulates the rates a carrier may charge for interstate telecommunications service. 47 U.S.C. §§ 201–205 (1982). As part of that task, the Commission sets the rate of return on capital that the carrier may use in setting its rates. *See, e.g., Nader v. FCC,* 520 F.2d 182, 191–92 (D.C. Cir.1975); *AT & T,* 86 F.C.C.2d 221, 223 (1981). The carrier then calculates its rates so that projected revenues will cover projected operating expenses plus the authorized return on capital. If the projections that underlie this calculation thereafter prove correct—such as estimates of labor and tax expenses, and the level of customer demand—then the carrier's net revenues will match precisely the carrier's authorized return. Obviously, this will virtually never occur, although the gap between the actual return and the projected return may more often than not be relatively small.

The Commission's refund rule was announced in *Authorized Rates of Return for Interstate Services of AT & T Communications and Exchange Telephone Carriers,* 50 Fed.Reg. 41,350 (1985), *reconsideration denied,* FCC No. 86–114 (Mar. 24, 1986), *further reconsideration denied,* FCC No. 86–544 (Jan. 14, 1987). The refund rule extends the use of the rate of return beyond its role in prospectively determining a carrier's rates. Specifically, the Commission would require a carrier to refund all revenues it ultimately collects

that exceed the target rate of return by more than a specified amount.

Under the refund rule, the Commission will set a target rate of return, and will require carriers to file rates reflecting the target, for a subsequent two-year period. The Commission will review the filed rates to determine whether they are just and reasonable, and in particular whether the carrier has properly incorporated the target return the Commission has set. *See* 50 Fed.Reg. at 41,351. This process does not significantly differ from what the Commission and the carriers have done in the past. But the refund rule also requires each carrier to compare the revenue it actually received during the two-year period with the revenue that, all else being equal, achievement of the target return plus a "buffer" increment would have produced during that same period.[1] If the carrier received more revenue than the target with the buffer would have produced, it must refund the excess to its customers.[2] *See id.* at 41,354–55 & n. 30.

In addition, the Commission's rule requires the carrier to apply this refund procedure not only to the revenue from its interstate operations taken as a whole, but also to the revenue from certain segments of the carrier's operations. Each of the segments employs rates that, by Commission rule, incorporate the target return. An excess of revenues in any one of those segments triggers a refund; a revenue shortfall below the target return in one segment may not offset an excess in another segment. *See* 50 Fed.Reg. at 41,352–53.[3]

The Commission, in two opinions on reconsideration of the refund rule, modified the rule in various ways but rejected all challenges to the rule's basic structure and operation. *See Memorandum Opinion and Order,* FCC No. 86–114 (Mar. 24, 1986) (order on reconsideration), *summarized in* 51 Fed.Reg. 11,033 (1986); *Memorandum Opinion and Order,* FCC No. 86–544 (Jan. 14, 1987) (order on further reconsideration). These petitions for review followed.

## II.

Petitioners assert that the rule as a whole violates the Communications Act, the Constitution, and the Administrative Procedure Act's prohibition of arbitrary and capricious agency action. *See* 47 U.S.C. § 402(g) (Supp. III 1985). They also challenge particular features and applications of the rule. We find one of these challenges dispositive. We agree that the Commission's refund rule is arbitrary and capricious agency action under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) (1982).

## A.

▮  Under the Communications Act, the Commission has the authority to prescribe rates for a carrier's interstate telecommunications services. *See* 47 U.S.C. § 205(a) (1982). This court has held that the Commission also has the power to prescribe the rate of return to be incorporated into the carrier's rates. *Nader v. FCC,* 520 F.2d at 203–04. The rate of return the Commis-

---

**1.** The Commission also indicated that each carrier may during the two-year period file tariffs that change the carriers' rates to narrow any anticipated gap between actual and targeted revenues at the end of the period. *See* 50 Fed.Reg. at 41,353 & n. 21. *But see infra* note 6.

**2.** The Commission determined that the buffer increment above the target would be 50 basis points (.50%) for AT & T. 50 Fed.Reg. at 41,351. For the local exchange companies, the increment is 25 basis points (.25%) for the target return covering all operations, and 40 basis points (.40%) for a segment of operations' target return. *Id.* at 41,353. While the Commission indicated that it would review these increments periodically, their review would not coincide

with the biennial revision of the rate of return. *Id.* at 41,351.

**3.** For this purpose, AT & T's interstate business is divided into two segments, switched services and private line services. The Commission derives the allocation of rates and earnings for the divisions from the Commission's Interim Cost Allocation Manual, which the Commission also employs to allocate AT & T's costs and target its rate levels prospectively. *See* 50 Fed.Reg. at 41,350–52. Pertinent business of the local exchange carriers is divided into three categories —common line, special access, and switched traffic sensitive. *See Reconsideration Order,* slip op. at 19, FCC No. 86–114 (Mar. 24, 1986).

sion prescribes must be sufficient to cover the cost of capital the carrier must raise to do business. *See United States v. FCC,* 707 F.2d 610, 612 (D.C.Cir.1983). The rate of return accordingly embodies the Commission's best estimate, in light of the evidence available to it, of the earnings needed to retain the carrier's capital investors and to attract additional required investment. *See id.*

■ Counsel for the Commission stated at oral argument that the rate of return the Commission prescribes "is the minimum that it can prescribe." Transcript of Oral Argument ("Tr.") at 29. This is consistent with the Commission's past pronouncements and the way this court has understood those pronouncements. *See United States v. FCC,* 707 F.2d 610, 612 & n. 4 (D.C.Cir.1983); *Nader,* 520 F.2d at 202, 204; *AT & T,* 86 F.C.C.2d at 223; *AT & T,* 57 F.C.C.2d 960, 960–61 (1976); *AT & T,* 38 F.C.C.2d 213, 226, 240–41, 245 (1972); *AT & T,* 9 F.C.C.2d 30, 52 (1967). Since the determination of a carrier's allowed rate of return requires a balance of investor and consumer interests, *see AT & T,* 86 F.C.C. 2d at 223; *AT & T,* 9 F.C.C.2d at 52; *see generally FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), the rate of return, as a balance point, represents "at the same time a minimum and a maximum" allowable return. Tr. at 29. If the rate were higher, the balance would tip in favor of the investor; if lower, it would tip in favor of the consumer. According to the Commission, therefore, its selected rate of return is the proper balance between these interests and hence the minimum return the carrier requires. *See United States v. FCC,* 707 F.2d at 612 & n. 4; *Nader,* 520 F.2d at 204; *AT & T,* 9 F.C.C.2d at 52.

It is true of course that a reviewing court may not overturn the Commission's selected rate of return so long as it lies within a "zone of reasonableness." *Jersey*

*Central Power & Light Co. v. FERC,* 810 F.2d 1168, 1177 (D.C.Cir.1987) (en banc), *quoting Washington Gas Light Co. v. Baker,* 188 F.2d 11, 15 (D.C.Cir.1950). But it is the Commission's understanding of its own task, and not our understanding of the court's task, that is before us in this case. The Commission has indicated, at oral argument in this case and in the past, that it prescribes a carrier's rate of return at what it considers to be the necessary minimum.

## B.

■ We think the Commission's refund rule cannot stand because it is inconsistent with the rate of return prescription it purports to enforce. *See, e.g., City of Lawrence v. CAB,* 343 F.2d 583, 588 (1st Cir. 1965).

The refund rule requires the carrier to refund any earnings above the upper bound of target plus buffer, while the carrier may not recoup any shortfall in its earnings below the target. A carrier cannot be expected to receive earnings each year at precisely the prescribed rate of return, and from one two-year period to the next it must forfeit any excess in earnings while absorbing any deficiency. Thus, over the long run the carrier is virtually guaranteed to fall short of earning its required target rate of return on its combined operations for all such periods viewed together. The Commission itself acknowledged that the refund rule introduces a "systematic bias" that operates to depress carrier earnings below their target "over the long run." 50 Fed.Reg. at 41,351.[4] Indeed, since the Commission views the rate of return as a minimum, the refund rule under the Commission's view would operate over the long run to put a carrier out of business. It should be stressed that this result does not reflect merely the business risk that a carrier is bound to accept under the accepted view that regulation does not

---

4. This comment occurs in the Commission's discussion of the "buffer" increment. The Commission seems to have thought that the buffer disposed of this problem, but it does not. The carriers' submissions indicate that in recent years they have consistently deviated from the

authorized return by far more than the buffer amount. *See, e.g.,* Joint Appendix at 136–37. But the carriers do admit, as they must, that if the buffer were large enough for a "careful carrier ... invariably [to] meet the target, this would be a different case." Tr. at 19.

guarantee the regulated company a profit. Rather, it is the Commission's refund rule that seems to guarantee the regulated company an economic loss.

The peaks-and-valleys problem also exists, of course, not merely in the long run but for each two-year period for which the Commission sets a target rate of return. A carrier with profitable and unprofitable business segments may easily find that making refunds on the profitable segments means that it earns less than the required minimum rate of return on its overall operations. The carriers' submissions to this court demonstrate that such an outcome is not at all unlikely. *See* Brief of Petitioner AT & T at 28 & n. 33; Reply Brief for the Named Petitioners and Intervenors at 11; Tr. at 22. Indeed, the Commission itself acknowledged that requiring refunds by business segment "may prevent a carrier from earning its overall authorized return" within a single two-year period. 50 Fed. Reg. at 41,353.[5]

Finally, we have seen that the Commission defines the target return it prescribes as a return that, if exceeded, would tilt the investor-consumer balance in the investors' favor and result in unjust and unreasonable prices for consumers. *See, e.g., AT & T,* 86 F.C.C.2d at 223. And it is undisputed that carriers must set their rates by reference to the prescribed return. But in its promulgation of the refund rule, the Commission rejected a suggestion that it eliminate any buffer and simply require the refund of all carrier earnings that exceed the target by saying that earnings within the buffer but above the target need not be refunded because "a target return is in reality a point within a zone of reasonableness. Returns that slightly exceed such a target have never been and should not be deemed unjust." 50 Fed.Reg. at 41,355. This statement contradicts the Commis-

sion's later explicit statement at oral argument before this court, and the Commission's prior statements, that the prescribed rate of return represents at once both the carrier's minimum and maximum necessary return. For this reason alone, we are constrained to invalidate the refund rule.

It may be that the Commission considers the rate of return for rate-setting purposes as something different from the rate of return for refund purposes (a question on which we take no position). It has not attempted to provide any such understanding to this court. On remand, if the Commission wishes to promulgate a new refund rule, it must clearly and specifically explain what it understands the rate of return to be and how that understanding is consistent with a refund rule.

We are convinced, therefore, that the Commission's own understanding of its rate of return prescription and of its refund rule constitutes a self-contradiction. Since we find that the refund rule as a whole is unreasonable agency action, it is not necessary for us to consider petitioners' other arguments.

### III.

For the guidance of the parties in case the Commission chooses to reformulate the refund rule, we offer comments on two of the issues raised by petitioners.

First, regarding petitioners' constitutional argument that the refund mechanism is an unconstitutional taking of their property, the Commission should explain how an operation of the mechanism on business segments that would result in pushing the carriers' total return below a reasonable level would be consistent with the constitutional doctrine that an agency rate order "viewed in its entirety" must produce a

---

5. The Commission also stated that the impact of the refund rule on the carriers would be blunted by each carrier's ability to adjust its rates during the two-year period if it believes that its earnings will miss the target. *See* 50 Fed.Reg. at 41,353. But the Commission has refused to say whether it will accept corrective rate filings that incorporate a return *higher* than the target, *see* Brief of Respondent at 33 n. 45, which is the

filing that a carrier whose earnings fell short of the target during the first year of the period would have to make. Even apart from the practical barriers to making corrective adjustments, *see* Tr. at 18–19, we will not rely on the ability to adjust when the Commission itself refuses to say whether it would permit all the adjustments that carriers would need to make.

just and reasonable "total effect" on the regulated business. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). Investors in a carrier, after all, must invest in the carrier as a whole, and not just in one or another of its business segments.

Second, we observe that a panel of this court has decided in *New England Telephone & Telegraph Co. v. FCC*, 826 F.2d 1101 (D.C.Cir.1987), that the Commission has statutory authority to employ a refund mechanism in conjunction with rate of return regulation.[6] In *New England Telephone*, the Commission had attempted in an individual case to exercise the very authority to impose refunds that it now seeks to assert generically. The Commission had ordered a rate refund of one hundred million dollars to reimburse consumers for 1978 earnings by the AT & T system in excess of the then-outstanding rate-of-return prescription. We determined that the Commission's order was a valid exercise of its ratemaking authority under the Communications Act. Specifically, we reiterated our holding in *Nader v. FCC*, 520 F.2d 182 (D.C.Cir.1975), that the Commission has power under section 205 of the Act to prescribe rates of return as well as rates. We then determined that the Commission's refund order was a reasonably necessary enforcement mechanism for its rate-of-return prescription and therefore was authorized under section 4(i) of the Act, which permits the Commission to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this [Act], as may be necessary in the execution of its functions." 47 U.S.C. § 154(i) (1982).

*New England Telephone* clearly defeats the claim that a refund scheme in conjunction with rate-of-return regulation is necessarily incompatible with the regulatory scheme embodied in the Communications Act. A prescription of a rate of return was described in *New England Telephone* as representing a proclamation by the Commission that earnings in excess of the prescribed rate are unlawful and shall not occur. *See New England Telephone*, 826 F.2d at 1106. The Commission's refund scheme was viewed therefore as simply forcing carriers to disgorge earnings they never had a right to collect. Although the enforcement mechanism that the Commission chose may not have been the only conceivable one, it was found to be within the range of reasonable remedies that the Commission may employ in its discretion under section 4(i). *Id.* at 1107–08. It should be noted, however, that the particular refund scheme at issue in *New England Telephone* was found by this court to provide "ample protection for the carriers' interests," and we went on to say, "[s]hould this state of affairs not hold in the future, the Commission and the courts can address the situation at that time." *Id.* at 1109.

Thus, as we previously have concluded, the Commission has authority under the Act to order refunds where a carrier has violated an outstanding rate-of-return prescription. That authority must, however, be exercised in a way that does not contradict the Commission's own theory of rate of return regulation. *See supra* pp. 1389–1392. An obvious example of a scheme that would be consistent with the Commission's view of the rate of return prescription as a minimum, is one in which the carrier, in addition to being required to return amounts that exceeded the target return, would be permitted to recover amounts by which it fell short of the target. We are confident that the Commission can imagine other schemes that would not tend to prevent carriers from earning the return needed to enable them to attract necessary capital. It is of course the Commission, not this court, that is empowered to exercise its judgment in choosing a course of action. We do not mean to suggest that any one valid course of action is preferable to any other. If the Commission's choice is to survive judicial scrutiny, however, it must conform to the Commission's understanding of its task. If the Commission wishes to reformulate that understanding, then to the extent that it is "changing its course[, it] must supply a

---

**6.** The opinion in *New England Telephone* issued after oral argument in this case, and a suggestion for rehearing *New England Telephone en banc* is currently pending before this court.

reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored...." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

We grant the petitions for review and remand the case to the Commission so that it may fashion, if it wishes, a refund mechanism that does not contradict the Commission's understanding of its rate of return prescription.

*It is so ordered.*

STARR, Circuit Judge, concurring:

I concur in the court's judgment and in much of its opinion. In my view, Congress well knew what it was doing in comprehensively and carefully crafting the Communications Act. That regime, I believe, does not allow the remedy that the agency has suddenly discovered a half-century after the Act's passage. Although a panel of this court has recently (during the period when the present case was *sub judice*) held to the contrary, that case is still pending before the court. Under these circumstances, it seems to me appropriate to set forth the reasons for my conclusion that the FCC's innovations of late are without statutory foundation.

**I**

The terms and structure of the Communications Act bear decisively upon the FCC's latter-day inspiration as to reach of its regulatory powers. Briefly stated, sections 201 to 205 of the Act deal with rates. Under section 203, the all-important requirement of filing a schedule of charges is laid out: "Every common carrier, except connecting carriers, *shall* ... file with the Commission ... schedules showing all charges." (emphasis added) This is an absolute condition precedent to doing business. Unless schedules have been filed, section 203(c) tells us, "no carrier ... shall engage or participate in such communication...." In addition, section 203(c) mandates that carriers scrupulously abide by the schedules as filed.

With this foundation, the statute goes on to provide the Commission with two instruments of control over the content of the schedules. Section 204(a) permits the Commission to suspend the operation of a newly filed charge while it investigates the rate's lawfulness and, after a full hearing, to make whatever order as "would be proper." Under section 205(a), the Commission is "authorized and empowered to determine and prescribe what will be the just and reasonable charge ... to be thereafter observed" if the "Commission shall be of [the] opinion that any charge ... is or will be in violation of any of the provisions of [the Act]...." This combination of powers represents an architecturally harmonious regulatory scheme: the Commission enjoys corrective power at both stages of the process. Under section 204, it may reject rates before a proposed schedule goes into effect; under section 205, it may prescribe new rates to override a schedule currently in effect.

Once the Commission has allowed the schedule to become effective, the statute sets forth specific methods of enforcement. If the carrier fails to abide by a filed tariff (in violation of section 203(c)), then the faithless carrier is subject to penalties (in the form of fines) under section 203(e). If a carrier knowingly fails or neglects to follow a prescription (in violation of section 205(a)), it is subject to penalties (also in the form of fines) under section 205(b). Each statutory section containing a specific mandate thus contains a corresponding penalty for violation (*see also* section 202(a), prohibiting discrimination in charges, and section 202(c), subjecting the carrier to penalties for violation of 202(a)). If, say, a section 205(a) prescription is violated, the Commission may invoke the remedial mechanism crafted specifically to deal with such violations (found in section 205(b)).

In crafting this elaborate scheme, Congress did not leave an injured customer without a remedy; to the contrary, the statute expressly provides for consumer remedies. In section 206, the carrier is put on notice that if it violates the Act, it will be liable to persons injured by its actions.

Sections 207–209 then set forth in detail the procedures through which an aggrieved customer can obtain relief. The statute is clear, however, that the customer must initiate these proceedings, save for one limited situation. Under section 204(a), if the Commission has suspended rates, but has been unable to complete its investigation and hearing within five months, the new or revised charge goes into effect. In that event, the Commission is authorized to require the carrier to account for all amounts received, and upon completion of the hearing, the agency may require the carrier to refund, with interest, the portion of amounts paid that was not justified.

An examination of the statute as a whole makes crystal clear that the schedule filed by a carrier serves as the foundation by which Congress' regulatory scheme achieves stability, predictability, and protection of the public interest. Once the schedule is filed and allowed to go into effect, carriers (and consumers) are entitled to rely on it, except for the one special situation addressed (and procedurally safeguarded) in section 204. This is not anything novel. In the analogous rate regulatory scheme administered by the ICC, the Supreme Court has repeatedly "stressed the importance of common carriers' being able to rely on effective tariffs on file with the Commission." *ICC v. American Trucking Associations, Inc.*, 467 U.S. 354, 364 n. 7, 104 S.Ct. 2458, 2464 n. 7, 81 L.Ed.2d 282 (1984) (referring to *Berwind-White Coal Mining Co. v. Chicago and Erie Railroad Co.*, 235 U.S. 371, 35 S.Ct. 131, 59 L.Ed. 275 (1914) and *Davis v. Portland Seed Co.*, 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762 (1924)). And there should be no doubt about the relevance of the Supreme Court's teaching under the "prototypical ratemaking statute, the Interstate Commerce Act"; it is well settled that "the principles of judicial review of agency refund decisions in ratemaking cases are of general applicability." *Las Cruces TV Cable v. FCC*, 645 F.2d 1041, 1047 (D.C.Cir. 1981). To observe but one example of this pervasiveness, recognition of the role of fidelity to filed schedules in ensuring stability and fairness undergirds the "filed rate

doctrine" articulated in the area of energy regulation. *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 576–79, 101 S.Ct. 2925, 2929–31, 69 L.Ed.2d 856 (1981). Under this doctrine, which "has its origins in ... cases interpreting the Interstate Commerce Act" and "has been extended across the spectrum of regulated utilities," *id.* at 577, 101 S.Ct. at 2930, the Commission "may not *impose* a retroactive rate regulation and, in particular, may not order reparations," *id.* at 578 n. 8, 101 S.Ct. at 2930 n. 8 (emphasis in original).

## II

In view of this carefully crafted scheme, it is apparent that the refund rule that the Commission advances here does clear violence to the values of stability and predictability that Congress so carefully enshrined in the Communications Act. In the Commission's Orwellian world, carriers are no longer able to rely on filed rates; instead, they go about their business in constant jeopardy of being forced to refund enormous sums of money, even though they complied scrupulously with their filed rates. The Commission, inspired by its own victory in *Nader*, has turned the regulatory world upside down.

The Act, which is purely prospective in design, manifestly does not contemplate this unsettling state of affairs. As I have detailed above, Congress constructed the Act so that the Commission's remedial power is limited to prospective relief: when the Commission determines that existing rates are excessive, it cannot order a refund of past payments under the revoked rate. Rather, the FCC can only correct the problem through a *prospective* prescription under section 205. The courts have consistently adhered to this basic rule of ratemaking. *See, e.g., Arizona Grocery Co. v. Atchison, Topeka and Santa Fe Railway Co.*, 284 U.S. 370, 390, 52 S.Ct. 183, 186, 76 L.Ed. 348 (1932) ("Where the Commission has ... declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time ... subject a carrier which conformed thereto to the payment of reparation measured by what the

Commission now holds it should have decided in the earlier proceeding to be a reasonable rate."); *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 189 n. 7 (D.C.Cir.1986) (the Commission "may not order a retroactive refund based on a post hoc determination of the illegality of a filed rate's prescription.").

The question is therefore whether *Nader* somehow indirectly demolished this longstanding example of harmonious statutory architecture. The answer, demanded by law and basic notions of democratic theory, is obviously no. Although *Nader* added a new wrinkle to the rate regulatory system by allowing the Commission to prescribe the rate of return (*a mere component of a rate*), I am at a loss to understand why *Nader* brings with it an *enforcement mechanism* that contravenes the terms, structure, and goals of the Act itself. To be sure, the Commission's *Nader*-blessed rate-of-return prescription would have more teeth with the "refund rule" in effect. But, that approach carries us too far. In the post-*Nader* world heralded by the Commission, the FCC's determination of what constitutes a just and reasonable rate would carry more force if the Commission could order a refund of (previously approved) rates collected in excess of the just and reasonable amount. That, however, is exactly what the statute (and the *Arizona Grocery/Sea Robin* line of cases) incontrovertibly prohibits.

That is not to say that the Commission is without recourse in that situation. Quite to the contrary, the FCC is at liberty to use its Congressionally conferred section 205 power to prescribe just and reasonable charges *for the future*. The result should be the same when the Commission is exercising the *ancillary* power approved in *Nader*: once it determines that a tariff is properly targeted to the prescribed rate of return and allows it to become effective, the Commission should repair to prospective revisions.

Indeed, since the Commission's duty is to ensure that *rates* are just and reasonable (not to ensure that a certain rate of return is met), *see* 47 U.S.C. § 201(b), it is passing

strange to allow the Commission to order refunds (and thereby undercut the Congressionally ordained values of stability and predictability) where a rate-of-return prescription is exceeded, but not where a just and reasonable charge is exceeded. Likewise, because the statute contains specific penalty provisions, it is unlikely that the Commission would have authority to require a refund when a filed tariff or a *rate* prescription is violated.

**III**

In sum, the terms and structure of this 53-year old statute prohibit the Commission's exercise of this newly discovered clawback authority. This conclusion is buttressed by the fact that one year before the passage of the Communications Act, Congress repealed section 15(a) of the Interstate Commerce Act, which contained a "recapture" provision strikingly similar to the agency-created one at issue in this case. From 1920 to 1933, the Interstate Commerce Act contained a provision that mandated the Commission to establish rates so that the "carriers as a whole" would earn a fair return. The provision also provided that, since "it is impossible ... to establish uniform rates ... which will adequately sustain all the carriers ... without enabling some of such carriers to receive a net railway operating income substantially and unreasonably in excess of a fair return," carriers who received an excessive return (which was deemed income in excess of 6% of the value of the railway property) would have to place half of the excess in a carrier-maintained reserve and half in a "general railroad contingent fund." Transportation Act of 1920, 41 Stat. 456, 488–91.

In 1933, Congress repealed the provision. It replaced the ill-fated scheme with a "rule of ratemaking," that is to say certain factors the Commission was to consider when setting rates. The Conference Report explains that the "experience of the last twelve years" showed (1) the impossibility of maintaining the level of rates required to produce the percentage rate fixed by the statute, and (2) the destabilizing (and debilitating) effects of changing the

rate level to meet the inevitable fluctuations in revenue. H.R.Conf.Rep. No. 213, 73rd Cong., 1st Sess. 29 (1933). The chairman of the ICC's legislative committee is quoted in the Report as stating: "[T]here is something incongruous in a system of regulation which finds it necessary to permit carriers to earn more than they ought to earn, and meets the difficulty by taking money away after it is received." *Id.* at 30.

It is evident that Congress agreed with the sober assessment of the chairman. And in the wake of that bitter lesson learned the hard way, it strains credulity to maintain, as the FCC does, that Congress meant in 1934 to weave silently into the Communications Act the same sort of refund authority that it found unworkable in the statutory paradigm, the Interstate Commerce Act.

Finally, it should not be assumed that my analysis defangs *Nader*, leaving it a toothless victory for the Commission. In *Nader* itself, it bears remembering, the "refund rule" was not even at issue. The Commission was fighting, instead, for other benefits that would flow from regulatory prescribing of rates of return. And those benefits were beguiling indeed—they included limiting carriers' discretion to initiate rate revisions, *see Nader*, 520 F.2d at 201, and giving the agency the ability summarily to reject any tariff revision designed to achieve more than the prescribed rate of return, *see id.* at 202. Now the Commission wants more. We should say no. This goes too far. We should limit the Commission to its not insubstantial fruits harvested in *Nader*, and avoid wreaking havoc in the communications industry and the previously architecturally sound and sensible law of ratemaking. In this age of deference to the largely unaccountable organs of government, we must not permit those quasiautonomous creatures of the political branches to tear asunder that which the representatives of the people have seen fit to ordain and maintain for a quarter of the Nation's history. To do so is a misguided affront to basic principles of republicanism.