The MOUNTAIN STATES TELEPHONE
AND TELEGRAPH COMPANY, et
al., Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Respondents,

American Telephone and Telegraph Co.,
et al., Intervenors.

No. 88–1262.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 23, 1989.

Decided July 23, 1991.

As Amended Aug. 20, 1991.

Robert B. McKenna, with whom Dana A. Rasmussen was on the brief, for petitioners.

Laurel R. Bergold, Attorney, F.C.C., with whom Catherine G. O'Sullivan and Andrea Limmer, Attorneys, Dept. of Justice, and Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel, F.C.C., were on the brief, for respondents.

Alfred Winchell Whittaker, with whom Melanie S. Fannin, David K. Hall, Floyd S. Keene, Linda Kent, Mark J. Mathis, Martin T. McCue, Patricia J. Nobles, Thomas A. Pajda, William C. Sullivan and Thomas L. Welch were on the briefs, for intervenors

**1022**

Southwestern Bell Telephone Co., U.S. Telephone Ass'n, and Ameritech, Bell Atlantic and NYNEX subsidiaries.

Francine J. Berry and Jules M. Perlberg entered appearances for intervenor American Tel. and Tel. Co.

Liam S. Cooper, Gregory J. Christoffel and Patricia J. Nobles entered appearances for intervenor Southwestern Bell Telephone Co.

Saul Fisher, Mary McDermott and Martin J. Silverman entered appearances for intervenors New York Telephone Company and New England Tel. and Tel. Co.

Michael J. Karson and James R. Young entered appearances for intervening Bell Atlantic subsidiaries.

Roderick A. Mette entered an appearance for intervenor TRT Telecommunications Corp.

Before STARR* and BUCKLEY, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge ROBINSON.

ROBINSON, Senior Circuit Judge:

Petitioners[1] are common carriers providing local telephone and other telecommunications services as subsidiaries of U.S. West, Inc., one of seven regional Bell operating companies emerging from the break-up of American Telephone and Telegraph Company (AT & T).[2] Joined by numerous intervening counterparts,[3] petitioners challenge orders[4] of the Federal Communications Commission directing AT & T and the regional Bells to alter their accounting treatment of a judgment suffered and litigation expenses incurred by AT & T in a lawsuit charging civil violations of the federal antitrust laws.[5] The carriers contend that these orders transgress the Communications Act of 1934[6] and the Administrative Procedure Act,[7] claims which respondents[8] vigorously resist. For the reasons that follow, we vacate the orders and remand the case to the Commission for further proceedings.

## I. THE ADMINISTRATIVE HISTORY

In 1976, Litton Industries, Inc., instituted an antitrust action against AT & T and its

---

* *Circuit Judge* (now Solicitor General) STARR did not participate in this opinion.

1. Petitioners are The Mountain States Telephone and Telegraph Company, Northwestern Bell Telephone Company and Pacific Northwest Bell Telephone Company.

2. See generally *United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

3. Intervenors are American Telephone and Telegraph Company; Illinois Bell Telephone Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, The Ohio Bell Telephone Company and Wisconsin Bell, Inc., subsidiaries of American Information Technologies Corporation; The Bell Atlantic Telephone Company of Pennsylvania, The Chesapeake and Potomac Telephone Company, The Chesapeake and Potomac Telephone Company of Maryland, The Chesapeake and Potomac Telephone Company of Virginia, The Chesapeake and Potomac Telephone Company of West Virginia, The Diamond State Telephone Company and New Jersey Bell Telephone Company, subsidiaries of Bell Atlantic Corporation; New York Telephone Company and New England Telephone and Telegraph Company, subsidiaries of NYNEX Corporation; Southwestern Bell Telephone Company and TRT Telecommunications Corporation, all of which, like peti-

tioners, are telecommunications carriers, and United States Telephone Association, a nonprofit organization whose members principally are providers of local telephone and other telecommunications services.

4. *American Tel. & Tel. Co.*, 98 F.C.C.2d 982 (1984) [hereinafter *Litton Order*], *reconsideration denied*, 3 F.C.C.Rcd 500 (1988) [hereinafter *Reconsideration Order*].

5. *See Litton Sys. v. AT & T*, 700 F.2d 785 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). The regional Bells share liability for the judgment and expenses in proportion to the net book value of assets transferred to them at divestiture. See *United States v. Western Elec. Co.*, 569 F.Supp. 1057, 1069–1074 (D.D.C.), *aff'd sub nom. California v. United States*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983); *Litton Order, supra* note 4, 98 F.C.C.2d at 987 n. 8.

6. Act of June 19, 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151–613 (1988)) [hereinafter cited as codified].

7. See 5 U.S.C. § 706(2)(A) (1988).

8. Respondents are the Federal Communications Commission and the United States of America.

subsidiaries alleging unlawful monopolization of the telephone terminal equipment market. Early on, the Commission's Common Carrier Bureau directed AT & T to account for, and report quarterly to the Commission, the expenses incurred in defending the action in order "that all such expenses are separately identified and maintained, for subsequent determinations as to whether these costs are properly chargeable to consumers or to stockholders." [9] Following a lengthy trial, a jury returned a verdict in Litton's favor, which was trebled to a judgment of some $276 million.[10] The Second Circuit affirmed on appeal [11] and the Supreme Court declined further review.[12]

Meanwhile, a separate antitrust suit, brought by the Department of Justice against AT & T, ended in a 1982 consent decree dismantling the unified Bell System and restructuring its components into AT & T and seven regional operating companies.[13] In the process, petitioners, which had been subsidiaries of AT & T and parts of the Bell System, became subsidiaries of U.S. West, Inc., one of the seven.[14]

Throughout the more than seven-year pendency of Litton, AT & T recorded its litigation expenses in "above the line" accounts as items normally treatable for ratemaking purposes as costs of doing business.[15] Shortly after Litton reached its terminus, the Commission's Common Carrier Bureau informed AT & T [16] and the regional Bells [17] that the amount of the judgment, including accrued interest, and their accumulated litigation expenses [18] should be transferred "below the line to Account 370," [19] and thus were not ordinarily to be reflected in charges to ratepayers. The Bureau's letter instructed the regionals to submit their supporting rationale if they felt that some or all of the items should be charged to other accounts. The regionals did object,[20] and thereupon the controversy before us was born.

The Commission modified the Bureau's proposal in one respect. It agreed with the carriers that interest on the judgment should be charged to a below-the-line account accorded special treatment in ratemaking proceedings.[21] The Commission, however, shared the Bureau's view that the amount of the judgment and the litigation expenses should be charged below the line, and thus deprived of any ratemaking significance unless the propriety of a role in ratemaking was demonstrated.[22] We sum-

9. Letter from Walter Hinchman, Chief, Common Carrier Bureau, Federal Communications Commission, to American Telephone and Telegraph Company (June 21, 1976) at 1, Appendix (App.) 2.

10. See Litton Sys. v. AT & T, supra note 5, 700 F.2d at 789.

11. Litton Sys. v. AT & T, supra note 5.

12. Litton Sys. v. AT & T, supra note 5.

13. See United States v. AT & T, supra note 2. The breakup was effectuated on January 1, 1984.

14. See id. at 165.

15. Letter from William R. Stump, Corporate Vice President, American Telephone and Telegraph Company, to Jack D. Smith, Chief, Common Carrier Bureau, Federal Communications Commission (Feb. 17, 1984) [hereinafter Stump Letter] at 1, App. 7.

16. Letter from Jack D. Smith, Chief, Common Carrier Bureau, Federal Communications Commission, to William R. Stump, Corporate Vice President, American Telephone and Telegraph Company (Feb. 6, 1984), App. 5.

17. E.g., Letter from Jack D. Smith, Chief, Common Carrier Bureau, Federal Communications Commission, to Ron H. Sirch, NYNEX (Feb. 6, 1984), App. 6.

18. At the end of 1983, accrued interest was $62.9 million, bringing the total of the judgment to almost $340 million. Stump Letter, supra note 15, at 1, App. 7; Litton Order, supra note 4, 98 F.C.C.2d at 982. Litigation expenses reached approximately $67 million in 1984. Id. at 987.

19. At that time, Account 370, captioned "Extraordinary Income Charges," included "charges to income resulting from nonrecurring transactions that are not customary business activities of the company." 47 C.F.R. § 31.370 (1987). See id. § 32.7620 (1990).

20. See, e.g., Stump Letter, supra note 15.

21. Litton Order, supra note 4, 98 F.C.C.2d at 983.

22. Id. at 983–988.

marize as briefly as feasible the course of the Commission's reasoning.[23]

The carriers argued "[t]hat lawsuits are a recurring fact of life in operating a business,"[24] and "[t]hat requiring [them] to record the judgment in account 370 would deny them the opportunity of seeking recovery of these costs in rate proceedings."[25] In response, the Commission made known its doubt that payouts for antitrust judgments should be recoverable:

> We agree generally that lawsuits are not uncommon in operating a business, and that companies must defend themselves against charges brought against them. We do not agree, however, that being found guilty of violating a statute should be regarded as a routine part of operating a business. Indeed, we believe that such a finding raises a serious question as to the allowability of the costs associated with such cases for ratemaking purposes, particularly the cost of the penalty imposed by the court. In this regard, account 370, which is used to record costs not ordinarily recognized for ratemaking, specifically provides that "penalties and fines for violations of statutes" shall be recorded therein. In our view, this provision of account 370 clear-

ly describes the judgment against AT & T in the *Litton* case.[26]

The Commission did not, however, share carriers' concern that below-the-line accounting of the judgment would necessarily emasculate it as a factor in ratemaking:

> The accounting classification of an item is not the final determinant of the ratemaking treatment. Any item of cost recorded in nonoperating (below-the-line) accounts can be identified by a carrier during a rate proceeding and included in rates if the carrier makes a positive and complete showing and the regulatory commission agrees that the costs should be allowed.[27]

With respect to the expenses of litigation, the Commission was influenced by "several indications in the past that the litigation costs associated with antitrust cases would be reviewed and questioned in future rate proceedings and that the outcome of the litigation may have a bearing on the allowability of these costs."[28] The Commission took the Supreme Court's decision in *NAACP v. FPC*[29] as authority to treat such expenses as "any other illegal, unnecessary, or duplicative costs."[30] The Commission hastened to add that expenses of antitrust litigation, like those of antitrust judgments, were not completely fore-

---

**23.** A good deal of the Commission's discussion involved the scope and function of various accounts. That we largely omit since it has no real bearing upon the disposition we make on this review.

**24.** *Litton Order, supra* note 4, 98 F.C.C.2d at 984.

**25.** *Id.*

**26.** *Id.* at 984–985.

**27.** *Id.* at 985–986.

**28.** *Id.* at 986.

**29.** 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976).

**30.** The Commission said:
In that case, the Court said that the FPC should disallow costs to the extent that they are "demonstrably the product of a regulatee's discriminatory employment practices [in violation of law]." The Court went on to say:
To the extent that [back pay] and other similar costs, such as attorney's fees, can be or have been demonstrably quantified by judi-

cial decree or the final action of an administrative agency charged with consideration of such matters, the Commission clearly should treat these costs as it treats any other illegal, unnecessary, or duplicative costs. . . .
The litigation costs incurred by AT & T as a result of its unsuccessful defense in *Litton* "are demonstrably the product of a regulatee's violation of federal statute," and they are readily quantifiable because they have been identified through accounting requirements imposed by the Common Carrier Bureau since 1976.
*Litton Order, supra* note 4, 98 F.C.C.2d at 987 (citations and footnote omitted). The Commission cited *NAACP v. FPC* as the source of all language set forth as a quotation. In its *Reconsideration Order,* the Commission recognized that the third quotation "does not appear in *NAACP v. FPC,* but appears instead to be a paraphrase of the language, 'demonstrably the product of a regulatee's discriminatory employment practices. . . .'" *Reconsideration Order, supra* note 4, 3 F.C.C.Rcd at 505 n. 41 (quoting *NAACP v. FPC, supra* note 29, 425 U.S. at 668, 96 S.Ct. at 1810, 48 L.Ed.2d at 290).

closed from recoupment in ratemaking proceedings:

> In the next general interstate and exchange access tariff filings by AT & T and the [Bell operating companies], we will examine these expenses to the extent that the carriers seek to avoid the ratemaking impact of this reclassification upon their revenue requirements. Because our accounting classification is not the final determinant of ratemaking treatment ..., the carriers will have the opportunity to demonstrate that portions of the litigation costs should be absorbed by interstate ratepayers. For example, litigation expenses that can be attributed specifically to the defense of counts on which AT & T was exonerated may be transferred back into the revenue requirement upon a proper showing by the carriers.[31]

On petitions for reconsideration, the Commission adhered to those holdings and expanded its reasoning somewhat. After announcement of its original decision, the Commission had conducted a rulemaking proceeding to establish general policies governing accounting treatment of adverse antitrust judgments and associated litigation expenses.[32] Therein, the Commission had determined that litigation expenses were to be recorded in above-the-line operating accounts as incurred, but if a final, adverse and nonappealable decision was entered against the carrier, the cumulative litigation expense would be disallowed in the next appropriate tariff proceeding.[33] This approach, the Commission said, while differing in some particulars, was fully consistent in principle with that taken in the *Litton Order.*[34] Summing up the effect of the two, the Commission stated:

> In both the *Litton Order* and the *USOA Antitrust Costs Order,* we

adopted an approach that would in the first instance presumptively remove from the ratemaking process the costs of litigation resulting from a carrier's violation of federal antitrust laws, while at the same time providing the carrier with an opportunity to show that in the circumstances of a particular case, it should be entitled to include such costs in interstate rates. This approach, in our view, strikes the proper balance between protecting ratepayers from having to bear the financial consequences of carriers' unlawful actions and permitting carriers to include such costs in rates when properly justified on equity or other public interest grounds.... [O]nce a final, adverse, and nonappealable antitrust judgment has been entered against a carrier, both Orders mandate a course of action specifically designed to prevent carriers from improperly passing the litigation expenses to ratepayers and thereby avoiding the financial consequences of their unlawful actions.[35]

The Commission also undertook to "clarify" the interpretation it gave *NAACP v. FPC* in the *Litton Order.* Several parties had complained that the Commission had "misconstrued and misquoted" that decision,[36] and had erroneously ruled that it supported disallowance for ratemaking purposes of expenditures for litigation of alleged violations of antitrust laws.[37] The Commission acknowledged that its earlier discussion had "implied that the case could be read as a general direction to federal regulatory agencies to record litigation expenses stemming from a regulatee's illegal conduct in below-the-line accounts in order to prevent their inclusion in revenue requirements,"[38] and that it had come belatedly to the realization that the Court "was addressing expenses and costs different

---

**31.** *Litton Order, supra* note 4, 98 F.C.C.2d at 987 (footnote omitted).

**32.** *Reconsideration Order, supra* note 4, 3 F.C.C.Rcd at 500, 502–503, referring to its *USOA Antitrust Costs Order,* 2 F.C.C.Rcd 3241 (1987).

**33.** *Reconsideration Order, supra* note 4, 3 F.C.C.Rcd at 500, 502–503.

**34.** *Id.* at 502–503.

**35.** *Id.* at 503.

**36.** *Id.* at 501. See note 30 *supra.*

**37.** *Id.*

**38.** *Id.* at 503 (footnote omitted).

from those at issue in the *Litton* Order," [39] but concluded:

> [W]hile *NAACP v. FPC* remains persuasive authority for the power of a regulatory agency to disallow expenses resulting from its regulatees' illegal conduct, that decision does not by itself mandate either disallowance or the below-the-line accounting treatment of the *Litton* litigation expenses, since it addresses a factual situation somewhat different than this proceeding. Nevertheless, even though the accounting treatment of litigation expenses in the *Litton Order* is not compelled by *NAACP v. FPC*, we affirm that treatment on the policy grounds discussed.... [40]

The Commission pointed out that in the *Litton Order* it had made plain that the carriers would have the opportunity in subsequent ratemaking proceedings to demonstrate what if any portions of their litigation expenses should be passed on to ratepayers.[41]

The Commission then turned to the antitrust judgment. It reaffirmed the determinations made in the *Litton Order*[42] and added a salient comment:

> A theme that runs through petitioners' pleadings is that judgments paid in antitrust proceedings are not penal, but merely remedial, and thus properly included in operating expenses. However, we do not view the distinction between "penal" and "remedial" payments to be

controlling for the purpose of determining the proper accounting treatment of antitrust judgments, because both types of payments arise after a court has concluded that a law has been violated. Antitrust damages are not the result of common law tort actions for accidental damages to persons or property, but are the consequences of a firm's violation of statutes designed to serve important public interests. Thus, the untrebled portion of the judgment in the *Litton* suit reflected the damages the jury found Litton to have suffered as a result of conduct by AT & T that was found to be unlawfully anticompetitive. The payment of these damages does not, in our view, constitute a normal operating expense.[43]

Petitioners then came to this court. They contend that below-the-line accounting and the accompanying presumption decreed in the *Litton Order* is arbitrary, capricious and otherwise contrary to law.[44] No complaint is registered with respect to the treatment accorded to the antitrust judgment or interest thereon, and our review is correspondingly limited.

## II. JUSTICIABILITY

At the outset, we address the Commission's contention that we cannot entertain petitioners' complaints at this stage. Two grounds are urged in support of this position. The first is that the challenged or-

---

**39.** *Id.* at 505 n. 42 (italics supplied). "For example," the Commission said, "although the Court indicated that" [*sic*] attorneys' fees were part of the costs that should be disallowed, we believe the attorneys' fees referred to in *NAACP v. FPC* are the plaintiff's fees paid by the defendant, not the defendant's own fees, which would be included in the litigation expenses addressed in *Litton.*" *Id.* (italics supplied). The Commission elaborated:

> The phrase "attorney's fees" or "attorney's fee" is a term of art in employment discrimination and other civil rights laws, such as Title VII of the Civil Rights Act of 1964, and is used in reference to the recovery by the prevailing party of attorneys' fees from the losing party.... The defendant's own litigation expenses, however, are not a part of, and bear no particular relationship to, the amount of compensation the defendant must provide the plaintiff in such actions. Since the Court in

> *NAACP* was referring to "attorneys' fees" in the context of a Title VII action for backpay, we think it likely that the Court was using that term in the same sense that it is used in the Title VII statute and in other employment discrimination laws.

*Id.* (citations omitted) (italics supplied).

**40.** *Id.* at 503 (footnote omitted).

**41.** *Id.* The Commission also rejected the contention that the *Litton Order*'s treatment of litigation expenses amounted to retroactive ratemaking, observing that it was addressing account reclassification, not ratemaking. *Id.*

**42.** *Id.*

**43.** *Id.* (footnote omitted).

**44.** Brief for Petitioners at 1.

ders are not "final" for purposes of appellate review.[45] According to the Commission, they call for no more than an accounting change enabling it to scrutinize litigation expenses should the carriers claim them in a future ratemaking proceeding. Thus, the Commission continues, "these orders merely set the stage for a potential future proceeding or proceedings 'in which the Commission might resolve satisfactorily all the claims of the parties.'"[46] And even if the orders are final, the Commission adds, the issues are not ripe for judicial review.[47] The controversy, it says, is not fit for resolution,[48] and the carriers have suffered no appreciable hardship because the "orders in themselves have no impact on the rates that the carriers may charge their customers."[49]

## A. Finality

■ Jurisdiction of the federal courts of appeals to examine the merits of Commission action is restricted to that which is incorporated into its "final orders."[50] We have limited the term "final order" to one that " 'imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of the administrative process.'"[51] An order may be final though it is not the very last step in the administrative process,[52] but it is not final if it "remains tentative, provisional, or

contingent, subject to recall, revision, or reconsideration by the issuing agency."[53] The bar to review of nonfinal orders "reflect[s] the reasoned policy judgment that the judicial and administrative processes should proceed with a minimum of interruption."[54]

We are satisfied that the action reflected in the two orders under attack was final. The first was unequivocal both in directing transfer of expenses in unsuccessful antitrust litigation to a below-the-line account and in attaching to them a strong presumption of illegitimacy in any subsequent ratemaking proceeding. In its order on reconsideration, the Commission reaffirmed these directives clearly and resoundingly. There was no indication that the Commission contemplated any change of mind with respect to either of these two subjects; rather, all that it left for later resolution was the entirely distinct question whether, in the context of ratemaking, a carrier has overcome the presumption—a matter not before us in this case. So, while the battle over the status in ratemaking of particular litigation expenses remains to be fought, the conflict over accounting methodology in the meantime is done with administratively. Encountering, then, no difficulty in consequence of the finality requirement, we move on to the Commission's objection that

**45.** Brief for Respondents at 10–13.

**46.** *Id.* at 11 (quoting *Western Union Int'l v. FCC,* 209 U.S.App.D.C. 143, 151, 652 F.2d 136, 144 (1980)).

**47.** *Id.* at 13–17.

**48.** *Id.* at 14.

**49.** *Id.* at 16–17.

**50.** 28 U.S.C. § 2342(1) (1988).

**51.** *NRDC v. United States Nuclear Regulatory Comm'n,* 220 U.S.App.D.C. 261, 266, 680 F.2d 810, 815 (1982) (quoting *Honicker v. Nuclear Regulatory Comm'n,* 192 U.S.App.D.C. 91, 93, 590 F.2d 1207, 1209 (1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 374 (1979)). See also *Reuters, Ltd. v. FCC,* 251 U.S.App.D.C. 93, 94 n. 1, 781 F.2d 946, 947 n. 1 (1986); *Bethesda–Chevy Chase Broadcasters, Inc. v. FCC,* 128 U.S. App.D.C. 185, 186, 385 F.2d 967, 968 (1967).

**52.** *Reuters, Ltd. v. FCC, supra* note 51, 251 U.S. App.D.C. at 94 n. 1, 781 F.2d at 947 n. 1. (citing *Bethesda–Chevy Chase Broadcasters, Inc. v. FCC, supra* note 51, 128 U.S.App.D.C. at 186, 385 F.2d at 968); *Isbrandtsen Co. v. United States,* 93 U.S.App.D.C. 293, 297, 211 F.2d 51, 55, *cert. denied,* 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954). This rule applies as much to orders affecting accounting procedures as to orders of other types. See *United States v. New York Tel. Co.,* 326 U.S. 638, 639–640, 66 S.Ct. 393, 394, 90 L.Ed. 371 (1946); *American Power & Light Co. v. SEC,* 158 F.2d 771, 784 (1st Cir.1946), *cert. denied,* 331 U.S. 827, 67 S.Ct. 1348, 91 L.Ed. 1842 (1947).

**53.** *NTEU v. FLRA,* 229 U.S.App.D.C. 355, 357, 712 F.2d 669, 671 (1983).

**54.** *Community Broadcasting v. FCC,* 178 U.S. App.D.C. 256, 258, 546 F.2d 1022, 1024 (1976) (footnote omitted). See also *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203, 210 (1970).

petitioners' claims are unripe for judicial review.

## B. *Ripeness*

 Ripeness and finality are similar but "analytically distinct" doctrines.[55] The "basic rationale" of ripeness is the need for agency functioning without involvement by the courts in "abstract disagreements over administrative policies, and ... protect[ion] [of] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."[56] Consistently with these objectives, and to enable determination as to when judicial intervention is warranted, courts look to see whether the issues are fit for judicial decision and whether deferral of review will visit hardship upon a party.[57] The ultimate question is whether "the interests of the court and the agency in postponing review until the question arises in some more concrete and final form [is] outweighed by the interest of those who seek relief from the challenged action's 'immediate and practical impact' upon them."[58]

In assessing fitness for judicial review, it is important to consider whether agency policy has crystallized,[59] whether the issue is "purely legal,"[60] and whether the agency or the court will benefit from postponing review until the "question arises in some

more concrete and final form."[61] Obviously, "[i]f the position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision,"[62] but that situation is not before us. The administrative record is comprehensive, the positions of the parties are polarized, and the administrative rulings are firm. The core issue—whether, on facts undisputed here, the Commission's action was arbitrary, capricious or contrary to law[63]—is wholly a legal question, as such susceptible to judicial resolution without further ado, and we do not perceive any benefit to be gained by postponing review. The Commission offers in that connection no more than that the carriers may attempt in future ratemaking proceedings to overcome the presumption against eligibility of antitrust litigation costs by pointing to special circumstances. Here again the Commission ignores the effects of its orders as final adjudications on the accounting techniques newly prescribed, and erroneously treats them as but interlocutory rulings in the midst of an incomplete administrative proceeding regarding rates.

We think it also plain that the Commission's new accounting procedures have inflicted hardship upon the carriers, and will continue to do so as long as they remain in vogue. A number of carriers promptly ad-

**55.** *Ticor Title Ins. Co. v. FTC,* 259 U.S.App.D.C. 202, 216–217, 814 F.2d 731, 745 (1987) (citations omitted).

**56.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967).

**57.** *Id.* at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691. See also *Eagle–Picher Indus. v. EPA,* 245 U.S. App.D.C. 179, 189, 759 F.2d 905, 915 (1985); *American Trucking Ass'ns v. ICC,* 241 U.S.App. D.C. 350, 352–353, 747 F.2d 787, 789–790 (1984); *Andrade v. Lauer,* 234 U.S.App.D.C. 384, 389, 729 F.2d 1475, 1480 (1984).

**58.** *Continental Air Lines v. CAB,* 173 U.S.App. D.C. 1, 19, 522 F.2d 107, 125 (1975) (en banc) (quoting *Frozen Food Express v. United States,* 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910, 914 (1956)).

**59.** *Eagle–Picher Indus. v. EPA, supra* note 57, 245 U.S.App.D.C. at 187, 759 F.2d at 913.

**60.** *Abbott Laboratories v. Gardner, supra* note 56, 387 U.S. at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691; *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697, 701 (1967); *Association of Am. R.Rs. v. ICC,* 270 U.S.App.D.C. 6, 24, 846 F.2d 1465, 1469 (1988); *Eagle–Picher Indus. v. EPA, supra* note 57, 245 U.S.App.D.C. at 189, 759 F.2d at 915.

**61.** *Continental Air Lines v. CAB, supra* note 58, 173 U.S.App.D.C. at 19, 522 F.2d at 125. See also *Abbott Laboratories v. Gardner, supra* note 56, 387 U.S. at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691; *Toilet Goods Ass'n v. Gardner, supra* note 60, 387 U.S. at 163, 87 S.Ct. at 1524, 18 L.Ed.2d at 701–702.

**62.** *Continental Air Lines v. CAB, supra* note 58, 173 U.S.App.D.C. at 19, 522 F.2d at 125.

**63.** See 5 U.S.C. § 706(2)(A) (1988).

vised the Commission of their concern that those procedures would cause them financial harm in their participation in industry revenue-cost pooling,[64] and we are told that their apprehension has since become a reality.[65] We thus conclude that the Commission's orders exert an "immediate and practical impact" on the carriers,[66] and that the ripeness doctrine presents no barrier to our consideration of the merits.

### III. THE LEGAL QUESTION

■ The Communications Act imposes upon the Commission the duty of regulating the rates chargeable for interstate telecommunications service [67] with a view to ensuring that they are just and reasonable.[68] The Commission fixes the rate of return to which the carrier is entitled,[69] whereupon the carrier sets its charges at levels sufficient to produce projected revenues covering projected operating costs together with the authorized return on capital.[70]

More than a half-century ago, the Supreme Court admonished regulatory agencies to "give heed to all legitimate expenses that will be charges upon income during the term of regulation." [71] We ourselves have observed that "[i]f [expenses are] properly incurred, they must be allowed as part of the composition of the rates. Otherwise, the so-called allowance of a return upon the investment, being an amount over and above expenses, would be a farce." [72] The Commission is in accord; it says that "[g]enerally, in determining rate of return, public service commissions must consider the sum required by the utility to meet its operating expenses." [73] But, as the Commission has aptly put it, regulatory authorities "may disallow expenses actually incurred in the company's operation where the challenged expense is found to be exorbitant, unnecessary, wasteful, extravagant, or incurred in the abuse of discretion or in bad faith, or of a non-recurring nature." [74]

The Commission has established a uniform system of accounts to which regulated carriers must adhere.[75] Expenses paid by carriers must be categorized and recorded in designated accounts in accordance with the Commission's detailed instructions. When the *Litton* antitrust suit got underway and for about eight years thereafter, the carriers kept track of their expenditures therefor in above-the-line accounts,[76] expecting that in ratemaking they would be factored into the carriers' operating costs in conformity with the Commission's accounting rules.[77] In 1982, the Commission, after an investigation into the

---

**64.** The National Exchange Carrier Association administers a pool that includes exchange carriers. Expenses are pooled, and any one carrier's expenses are shared by all other members. Thus, to the extent that a carrier's expenses are reduced on its books, it cannot recover from any other participant in the pool. See Petition of Bell Companies for Reconsideration at 3, App. 20; Petition of Illinois Bell Telephone Company for Reconsideration at 15–17, App. 49–51.

**65.** Joint Reply Brief for Petitioners and Intervenors at 6, 10.

**66.** *Continental Air Lines v. CAB, supra* note 58, 173 U.S.App.D.C. at 19, 522 F.2d at 125 (internal quotes and citation omitted).

**67.** 47 U.S.C. §§ 201–205 (1988).

**68.** *Id.* § 204(a).

**69.** E.g., *AT & T v. FCC,* 267 U.S.App.D.C. 38, 40, 836 F.2d 1386, 1388 (1988); *Nader v. FCC,* 172 U.S.App.D.C. 1, 10–11, 520 F.2d 182, 191–192 (1975).

**70.** E.g., *AT & T v. FCC, supra* note 69, 267 U.S.App.D.C. at 40, 836 F.2d at 1388.

**71.** *West Ohio Gas Co. v. Public Utils. Comm'n,* 294 U.S. 63, 74, 55 S.Ct. 316, 322, 79 L.Ed. 761, 771 (1935).

**72.** *Mississippi River Fuel Corp. v. FPC,* 82 U.S. App.D.C. 208, 212, 163 F.2d 433, 437 (1947).

**73.** Policy to be Followed in the Allowance of Litigation Expenses of Common Carriers in Ratemaking Proceedings, 92 F.C.C.2d 140, 144 (1982) [hereinafter *Policy Decision* ].

**74.** *Id.* (citations omitted).

**75.** See 47 U.S.C. § 220 (1988 & West Supp.1990); 47 C.F.R. pt. 32 (1990).

**76.** See *Litton Order, supra* note 4, 98 F.C.C.Rcd at 983.

**77.** *Id.* at 986.

propriety of then-existent practices in this regard, found "that the present ratemaking treatment of litigation expenses adequately protects the public interest and that no new policy need be implemented at this time." [78] Concomitantly, the Commission assigned to its Telecommunications Industry Advisory Group, which then was rewriting the Commission's uniform system of accounts for telecommunications companies, "the responsibility of determining whether and to what extent any change is necessary in the accounting or reporting of litigation expenses or settlements of antitrust lawsuits in order to facilitate ratemaking scrutiny of such expenses." [79] Yet, only two years later and apparently without awaiting a response from the group,[80] the Commission issued the accounting directive and formulated the presumption that bred the current controversy.

Beyond cavil, the Commission's *Litton Order* erects a formidable though not impregnable barricade to recovery of a carrier's antitrust litigation expenditures in a lost cause. Above-the-line accounting "creates a presumption that such expenses will normally be included in the [carrier's] revenue requirement." [81] In contrast, as the Commission itself has noted, its *Litton* approach "in the first instance presumptively remove[s] from the ratemaking process the costs of litigation resulting from a carrier's violation of federal antitrust laws." [82] Moreover, "the presumption for ratemaking purposes created by recording costs in a 'below-the-line' account is difficult to re-

but;" [83] the carrier must make "a positive and complete showing" convincing the Commission that the costs should be allowed for ratemaking purposes.[84]

We have not been referred to any authority either mandating or unequivocally authorizing the Commission's singular accounting prescription or presumption. In the *Litton Order*, the Commission relied upon the Supreme Court's decision in *NAACP v. FPC* [85] for the proposition that litigation expenses attributable to a carrier's antitrust violation are, without more, excludable from rate computations.[86] On rehearing, the Commission admitted that it had exaggerated the impact of the decision,[87] but insisted that it "remains persuasive authority for the power of a regulatory agency to disallow expenses resulting from its regulatees' illegal conduct." [88] We think the Commission has read *NAACP* too loosely.

The question the Court addressed in that case was "to what extent, if any, the Federal Power Commission, in the performance of its functions under the Federal Power Act ... and the Natural Gas Act ... has authority to prohibit discriminatory employment practices on the part of its regulatees." [89] One of the contentions was that the Commission is under a duty to promote the public interest, and thus that it is "authorized if not required to promulgate rules prohibiting its regulatees from engaging in discriminatory employment practices, since ending discrimination in employment is in

---

78. *Policy Decision, supra* note 73, 92 F.C.C.2d at 141.

79. *Id.* See also *id.* at 147.

80. See *Litton Order, supra* note 4, 98 F.C.C.2d at 988.

81. *USOA Antitrust Costs Order, supra* note 32, 2 F.C.C.Rcd at 3243. Of course, "[a]ny expense in an above-the-line account may be disallowed in a particular rate proceeding if [the Commission] conclude[s] that the circumstances do not justify recovering that expense from customers of regulated telecommunications services." *Id.*

82. *Reconsideration Order, supra* note 4, 3 F.C.C.Rcd at 503.

83. *USOA Antitrust Costs Order, supra* note 32, 2 F.C.C.Rcd at 3257.

84. *Litton Order, supra* note 4, 98 F.C.C.2d at 986. See also *Reconsideration Order, supra* note 4, 3 F.C.C.Rcd at 505 n. 38.

85. *Supra* note 29.

86. See note 30 *supra* and accompanying text.

87. See note 30 *supra.*

88. See text *supra* at note 40.

89. *NAACP v. FPC, supra* note 29, 425 U.S. at 663, 96 S.Ct. at 1808, 48 L.Ed.2d at 288 (statutory citations omitted).

the public interest."[90] The Court spurned so broad an argument[91] but it did agree that in view of the commands of both statutes to establish just and reasonable rates, "[t]he Commission clearly has the duty to prevent its regulatees from charging rates based upon illegal, duplicative, or unnecessary labor costs."[92] The Court continued:

To the extent that such costs are demonstrably the product of a regulatee's discriminatory employment practices, the Commission should disallow them. For example, when a company complies with a backpay award resulting from a finding of employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ..., it pays twice for work that was performed only once. The amount of the backpay award, therefore, can and should be disallowed as an unnecessary cost in a ratemaking proceeding.

To the extent that these and other similar costs, such as attorney's fees, can be or have been demonstrably quantified by judicial decree or the final action of an administrative agency charged with consideration of such matters, the Commission clearly should treat these costs as it treats any other illegal, unnecessary, or duplicative costs.[93]

By our analysis, *NAACP v. FPC* does not underpin the Commission's unqualified and wide ranging thesis. Illegality of carrier conduct from which an antitrust litigation expense stems does not inexorably compel or warrant either rejection or stigmatization of the expense as a factor in rate calculations. As the Court made explicit, the agency "is authorized to consider the consequences of discriminatory employment practices on the part of its regulatees only insofar as such consequences are directly related to the Commission's establishment of just and reasonable rates in the public interest,"[94] and we think the Feder-al Communications Commission is correspondingly limited when it deals with antitrust litigation expenses. Moreover, a pervasive element in ratemaking is reasonableness, which demands inquiry beyond the bare fact of antitrust violation. Of course, our present concern is accounting and presumption, not ratemaking, but the Commission forged the kinship of the three when it leaned on its expected ratemaking treatment of such expenses in its attempt to validate the related accounting and burden-of-proof requirements.

Our conclusion is buttressed by two Supreme Court decisions in the closely analogous field of taxation. In *Commissioner v. Heininger*,[95] a dentist who was unsuccessful in defense of his denture advertisements against a charge of fraud was denied an income tax deduction for his litigation costs on the ground that they were not ordinary and necessary business expenses. The theory was that since dentists do not usually resort to deception in advertising their wares, the expenses, which he would not have incurred but for the fraud, could not be regarded as either "ordinary" or "necessary."[96] The Supreme Court characterized this reasoning as "unsound"[97] and held that the expenses were deductible:

It is plain that [the dentist's] legal expenses were both "ordinary and necessary" if those words be given their commonly accepted meaning. For [the dentist] to employ a lawyer to defend his business from threatened destruction was "normal"; it was the response ordinarily to be expected. Since the record contains no suggestion that the defense was in bad faith or that the attorney's fees were unreasonable, the expenses incurred in defending the business can also be assumed appropriate and helpful, and therefore "necessary."

\* \* \* \* \* \*

---

**90.** *Id.* at 666, 96 S.Ct. at 1810, 48 L.Ed.2d at 289.

**91.** *Id.* at 669–671, 96 S.Ct. at 1811–1812, 48 L.Ed.2d at 291–292.

**92.** *Id.* at 668, 96 S.Ct. at 1810, 48 L.Ed.2d at 289.

**93.** *Id.* at 668, 96 S.Ct. at 1810–1811, 48 L.Ed.2d at 290.

**94.** *Id.* at 671, 96 S.Ct. at 1812, 48 L.Ed.2d at 292.

**95.** 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943).

**96.** *Id.* at 472, 64 S.Ct. at 253, 88 L.Ed. at 175.

**97.** *Id.*

Upon being served with notice of the proposed fraud order [the dentist] was confronted with a new business problem which involved far more than the right to continue using his old advertisements.... So far as appears from the record [the dentist] did not believe, nor under our system of jurisprudence was he bound to believe, that a fraud order destroying his business was justified by the facts or the law. Therefore he did not voluntarily abandon the business but defended it by all available legal means. To say that this course of conduct and the expenses which it involved were extraordinary or unnecessary would be to ignore the ways of conduct and the forms of speech prevailing in the business world.[98]

Similarly, in *Commissioner v. Tellier*,[99] a securities dealer convicted of securities and mail-fraud offenses claimed an income tax deduction for the legal fees incurred in defending himself. Although it was conceded that the fees were ordinary and necessary expenses of the dealer's securities business, the deduction was disallowed on the ground of public policy, and that, the Supreme Court ruled, was error. When Congress has been wholly silent, the Court noted, "[o]nly where the allowance of a deduction would 'frustrate sharply defined national or state policies proscribing particular types of conduct' has disallowance been upheld;"[100] furthermore, "the 'policies frustrated must be national or state policies evidenced by some *governmental* declaration of them.'"[101] That, the Court said, was not the case before it:

No public policy is offended when a man faced with serious criminal charges employs a lawyer to help in his defense. That is not "proscribed conduct." It is his constitutional right.[102]

The action of the Commission under scrutiny encounters yet another difficulty. By the Commission's formula, only if the carrier loses in the antitrust suit are the expenses thereof moved below the line, and only then does the presumption against their consideration in ratemaking come into play. Success or failure in the antitrust litigation thus becomes the sole determinant of these consequences, and this success-failure standard has met disfavor in parallel contexts. In *Commissioner v. Heininger*,[103] the Supreme Court indicated that the dentist's litigation expenses were deductible "without regard to the success of the defense,"[104] and the Fourth Circuit has reached the same result. In *Appalachian Electric Power Co. v. FPC*,[105] the utility lost its bid to establish judicially that it needed no license to construct a power plant, and thereafter it was denied recoupment of its litigation expenses. Since the utility was unsuccessful, the agency reasoned, the money it spent "did not benefit [or] contribute anything to ... the construction, operation or maintenance of the licensed project...."[106] The court disagreed; in its view, "there can be no question but that the proper expenses of the litigation should be treated, not as a general loss chargeable against earned surplus,

---

**98.** *Id.* at 471–472, 64 S.Ct. at 252–253, 88 L.Ed. at 175–176 (citations omitted). As the Second Circuit has observed:

What *is* ordinary is that the conduct of almost any trade or business will give rise to claims, many invalid but some valid; resisting such claims, paying judgments rendered on some, and settling others, is thus an "ordinary and necessary" expense of "carrying on any trade or business...."

*Ditmars v. Commissioner*, 302 F.2d 481, 485 (2d Cir.1962) (emphasis in original).

**99.** 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966).

**100.** *Id.* at 693–694, 86 S.Ct. at 1122, 16 L.Ed.2d at 190 (quoting *Commissioner v. Heininger, su-*

*pra* note 95, 320 U.S. at 473, 64 S.Ct. at 253, 88 L.Ed. at 176 (1943)).

**101.** 383 U.S. at 694, 86 S.Ct. at 1122, 16 L.Ed.2d at 190 (quoting *Lilly v. Commissioner*, 343 U.S. 90, 97, 72 S.Ct. 497, 501, 96 L.Ed. 769, 774 (1952)) (emphasis in original).

**102.** 383 U.S. at 694, 86 S.Ct. at 1122, 16 L.Ed.2d at 190 (citations omitted).

**103.** *Supra* note 95.

**104.** 320 U.S. at 472, 64 S.Ct. at 253, 88 L.Ed. at 176.

**105.** 218 F.2d 773 (4th Cir.1955).

**106.** *Id.* at 774.

but as an expense ... necessary to the development of the project."[107] The court explained:

> The fact that the litigation was not successful is no reason for not capitalizing its necessary cost as a part of the cost to the company of the property involved. The government was asserting rights with respect to the property which, if sustained, would greatly impair its value. The company had the best of reasons for thinking that these rights were not well founded.... In this posture of affairs it was not only wise but necessary that a court decision be obtained to set these questions at rest; and there is no reason why the cost of such proceedings should not be treated as a part of the cost of the property to which they related. It is no answer to say, as does the Commission, that the litigation was for the purpose of avoiding a license and that the only cost allowed by the statute is the cost of a licensed project. The litigation was unquestionably undertaken for the benefit of the project ... and the costs of that litigation were a part of the legitimate costs of bringing that project into being. Any business man would so regard them, any purchaser of the project would so regard them and there is nothing in the [governing legislation] which requires that they be treated in any other manner.[108]

We thus are not persuaded that the Commission's legal rationale for its broad position finds a safe haven in the caselaw. The Commission makes clear that an adjudicated antitrust violation, standing alone, will invariably trigger its accounting directive and the accompanying presumption,

but pertinent decisions convince us that logic and reasonableness require a wider and more discriminating focus. In its order on reconsideration, however, the Commission defended its action on regulatory policy as well as legal precedent.[109] We turn, then, to examine this alternative ground.

## IV. THE POLICY QUESTION

The Communications Act confers upon the Commission broad authority to "prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to [its jurisdiction], including the accounts, records, and memoranda of ... the receipts and expenditures of moneys."[110] Even so, this power cannot be exercised arbitrarily, capriciously, or in contravention of law.[111] We find ourselves unable to make a determination on that score because the Commission has not adequately explained the reasoning underlying its new policy toward accounting and ratemaking treatment of antitrust litigation expenses.

In its *Litton Order*, the Commission did not mention regulatory policy at all; it rested solely upon its expansive interpretation of *NAACP v. FPC*.[112] In its order on reconsideration, the Commission reduced but still maintained some of its reliance upon that decision, but added that its approach "[struck] the proper balance between ratepayers from having to bear the financial consequences of carriers' unlawful actions and permitting carriers to include such costs in rates when properly justified on equity or other public interest

---

**107.** *Id.* at 777.

**108.** *Id.* at 777. See also *E.I. du Pont de Nemours & Co. v. United States*, 432 F.2d 1052, 1058 (3d Cir.1970); *Central Coat, Apron & Linen Serv., Inc. v. United States*, 298 F.Supp. 1201, 1206 (S.D.N.Y.1969).

**109.** *Reconsideration Order, supra* note 4, 3 F.C.C.2d at 502–503.

**110.** 47 U.S.C. § 220(a) (1988).

**111.** See 5 U.S.C. § 706(2)(A) (1988).

**112.** The Commission stated that it relied "in part" upon that decision. *Litton Order, supra* note 4, 98 F.C.C.2d at 987. We find no other justification in its discussion save an asserted need to reclassify operating costs to Account 370 in order "to highlight them and to assure that they are considered in future rate proceedings." *Id.* at 986. This claim seems dubious since as early as 1976 the Common Carrier Bureau took steps to accomplish just that. See text *supra* at note 9.

grounds." [113] So, "even though the accounting treatment of litigation expenses in the *Litton Order* is not compelled by *NAACP v. FPC*," the Commission said, "we affirm that treatment on the policy grounds discussed." [114] These statements raise more questions than they purport to answer.

Is the Commission saying that the new procedure, with below-the-line movement of antitrust litigation expenses and an adverse presumption, better "strikes the proper balance" between utility and consumer than does the time-tested traditional procedure featuring above-the-line accounting and a burden of justification only upon challenge, which only two years previously the Commission had probed deeply and found adequate? [115] If the new procedure is superior, how so; if not, why the change? We are left equally in the dark by the Commission's reference to justification "on equity or other public interest grounds." [116] This terminology is much too general to provide any real insight, and the Commission does not elucidate.

Surveyed in its broader perspective, the Commission's reasoning becomes even more obscure. The Commission has not told us what it is about violations of the federal antitrust statutes that relegates associated litigation expenses to especially unfavorable treatment. We might say the same about breaches of state antitrust statutes, and of common-law strictures, federal and nonfederal. Every lawsuit involves some claimed infraction of the law, and just why the Commission drew the line where it did remains a mystery.

Perhaps the most puzzling aspect of the Commission's policy is just how regulatees can abide by it and still operate efficiently. It has long been the conventional rule that utility expenses prudently incurred are allowable in ratemaking.[117] "Good faith is to be presumed on the part of the managers of a business," [118] the Supreme Court has declared, and "[i]n the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay." [119] We agree that "lawsuits are a recurring fact of life in operating a business" [120]—and in that even the Commission concurs [121]—and litigation strategies undoubtedly are a recurring if indeed not a constant business challenge. Antitrust suits frequently present a multitude of complex issues, many of which may be intertwined with esoteric economic concepts in a legal context where precedents and clear standards may be hard to come by.[122] Serious strategy planning may at best be difficult, and under the Commission's regimen may be well-nigh impossible. Planning for any given antitrust case must be done in total ignorance of the factor the Commission deems critical—the final outcome of the case—and in the ominous shadow of the looming adverse presumption. Petitioners hardly exaggerate when they declare that no one could possibly predict that defense of a lawsuit as difficult as *Litton* would be ultimately successful. We believe the tension between longstanding judicial and newly devised administrative procedures could hardly be more severe.

To be sure, "the formulation of procedures [is] basically to be left within the discretion of the agencies to which Con-

**113.** *Reconsideration Order, supra* note 4, 3 F.C.C.Rcd at 503.

**114.** *Id.*

**115.** See notes 32–35 *supra* and accompanying text.

**116.** The Commission has furnished but one example: expenses attributable specifically to counts on which the carrier was exonerated. *Litton Order, supra* note 4, 98 F.C.C.2d at 987.

**117.** E.g., *West Ohio Gas Co. v. Public Utils. Comm'n, supra* note 71, 294 U.S. at 72, 55 S.Ct. at 321, 79 L.Ed. at 769.

**118.** *Id.*

**119.** *Id.*

**120.** See text *supra* at note 24.

**121.** See text *supra* at note 26.

**122.** We have described the *Litton* litigation as "lengthy and complex." *Jack Faucett Assocs., Inc. v. AT & T*, 240 U.S.App.D.C. 103, 108, 744 F.2d 118, 123 (1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985).

gress has confided the responsibility for substantive judgments."[123] But while "an agency is free to alter its past rulings and practices ... [it] must provide a reasoned explanation for any failure to adhere to its own precedents."[124] That explanation must establish a " 'rational connection between the facts found and the choice made,' "[125] and must be articulated "with sufficient clarity or specificity to permit [a court] to engage in meaningful review."[126]

The Commission's decision to presume the illegitimacy of antitrust litigation expenses and cast them below the line was undeniably a radical departure from its past practice. We find the Commission's expositions of its underlying reasoning "intolerably mute,"[127] lacking enough clarity and detail to blaze an analytical trial enabling judicial review under applicable legal standards. We accordingly vacate the challenged orders and remand the case for further consideration. We do not suggest that the Commission cannot provide an acceptable rationale for application of the challenged orders in the precise form in which they are, or that it is powerless to bind carriers to the strictures of those orders in some situations. We do say that before the Commission may do either in any instance, it first must come forth with what the law demands.

*So ordered.*

**123.** *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460, 467 (1978). See also *FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383, 391 (1965); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656, 659 (1940).

**124.** *Hatch v. FERC,* 210 U.S.App.D.C. 110, 119, 654 F.2d 825, 834 (1981). See also *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443, 466 (1983); *Center for Science in Pub. Interest v. Department of Treasury,* 254 U.S.App.D.C. 328, 332, 797 F.2d 995, 999 (1986); *United States Lines v. FMC,* 189 U.S.App.D.C. 361, 368, 584 F.2d 519, 526 (1978).

**125.** *Farmers Union Cent. Exchange, Inc. v. FERC,* 236 U.S.App.D.C. 203, 216, 734 F.2d 1486,

1499, *cert. denied,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962)).

**126.** *Celcom Communications Corp. v. FCC,* 252 U.S.App.D.C. 235, 239, 789 F.2d 67, 71 (1986). And see *Federal Election Comm'n v. Rose,* 256 U.S.App.D.C. 395, 402, 806 F.2d 1081, 1088 (1986); *Center for Science in Pub. Interest v. Department of Treasury, supra* note 124, 254 U.S.App.D.C. at 331–332, 797 F.2d at 998–999; *North Ger. Area Counsel v. FLRA,* 256 U.S.App.D.C. 340, 346, 805 F.2d 1044, 1050 (1986).

**127.** *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).