**BLACKFEET NATIONAL BANK,
et al., Plaintiffs,**

v.

**Robert E. RUBIN, Secretary of
the Treasury, Defendant.**

**Civ. A. No. 95–0979.**

United States District Court,
District of Columbia.

June 29, 1995.

Dennis M. Gingold and Thaddeus Holt, Washington, DC, for plaintiffs.

Stuart D. Gibson, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

FRIEDMAN, District Judge.

### BACKGROUND

American Deposit Corporation ("ADC") developed an innovative financial instrument, which it named the Retirement CD, to exploit a tax code provision permitting companies other than insurance companies to issue tax-deferred annuities. *See* 26 U.S.C. § 1275(a)(1)(B). The Retirement CD has many of the characteristics of an ordinary certificate of deposit. By combining the CD with a deferred refund annuity, however, ADC attempted to shelter interest income from taxation until that income is withdrawn.[1] By contrast, interest earned on a regular CD is taxable each year as it accrues, even if payment of the interest is postponed. The Retirement CD was designed specifically to compete with insurance company issued tax deferred annuities. Such annuities postpone inclusion in gross income of accumulated interest until the interest is withdrawn, usually at or after the purchaser's retirement when the individual's tax rate would be lower than at the time the interest accumulated.

ADC obtained approval from the Comptroller of the Currency to permit banks to offer the Retirement CD on certain conditions designed to assure the safe and sound operation of the program. It also obtained approval from the FDIC to treat the prematurity portion of a Retirement CD as an FDIC insured bank deposit, a feature that does not apply to insurance company offered annuities. Affidavit of James F. Malloy ("Malloy Aff."), Ex. F Attachs. B, C. Both the Comptroller of the Currency and the FDIC made clear that they could express no opinion on the tax treatment to be accorded the Retirement CD under the Internal Revenue Code. Affidavit of Richard E. Fasold, Ex. 1 (page 1) and Ex. 2 (page 9). At no time has ADC sought a ruling or other assurance from the Internal Revenue Service that tax on interest earned on funds deposited in a Retirement CD may be deferred.

ADC proceeded to license the Retirement CD to 11 banks, including plaintiffs Blackfeet National Bank, a small bank on the Blackfeet Indian Reservation in Montana, and First National Bank of Santa Fe ("FNB Santa Fe"). Both banks began to market the Retirement CD to depositors.

The IRS caught wind of the Retirement CD when a *New York Times* article reported that ADC claimed to have "discussed the product with the Internal Revenue Service and received a private letter confirming that interest on the account would receive the tax deferred treatment of an annuity." Malloy

---

1. The Retirement CD is a bank-issued certificate of deposit insured by the Federal Deposit Insurance Corporation ("FDIC"). A customer purchases a Retirement CD by opening an account at a bank licensed to issue the instrument, purchasing a CD and choosing a maturity date for the CD. The period between the opening of the account and the maturity date is the accumulation period for the Retirement CD. During the accumulation period, the depositor may make additional deposits. Any withdrawal of funds during the accumulation period is subject to a penalty of at least one percent of the amount withdrawn, but the penalty is waived if the depositor dies or becomes disabled prior to the maturity date.

At the maturity date, the depositor is entitled to withdraw up to two-thirds of the accumulated balance without penalty. The one-third or more that remains in the account is then paid out in periodic installments over the depositor's lifetime. The installment amounts are based on the life expectancy of the depositor, the balance in the account not withdrawn at maturity and the agreed upon fixed or variable interest rate. The Retirement CD has a refund feature guaranteeing that if the depositor dies before the periodic payments equal the amount accumulated and not otherwise withdrawn, a lump sum payment of the difference between the maturity balance and the periodic payments already paid out is made to the depositor's beneficiaries. If the depositor lives longer than anticipated, he or she receives periodic payments in excess of the maturity balance.

Aff. ¶ 5, Ex. A.[2]  After confirming that no "private letter ruling" had been issued by the IRS and that no member of the Financial Institutions and Products Section of the IRS remembered speaking with the developers of the Retirement CD, the staff of the IRS Assistant Chief Counsel, James F. Malloy, met with representatives of the Tax Legislative Counsel's office of the Treasury Department and resolved to initiate a regulations project to address the tax treatment of a product such as the Retirement CD.  Malloy Aff. ¶¶ 7, 9.

Regulations Project FI–33–94 was opened on May 17, 1994.  The project was announced on November 14, 1994 in the first Semiannual Agenda of Regulations published after the regulations project was opened.  59 Fed.Reg. 58031, 58047 (1994).  Over the course of the regulations project the IRS developed two concerns: (1) whether the Retirement CD's early withdrawal feature excluded it from the definition of a "debt instrument," and (2) whether the flexible maturity date could result in a substantial tax deferral.  Malloy Aff. ¶ 11, 12.  As a result of its study of this product, the Treasury Department published a notice of proposed rulemaking and proposed regulations, announcing a public comment period and public hearing, in the Federal Register on April 7, 1995.  If promulgated in final form, these regulations would require that in order for tax on interest income from an annuity issued by other than an insurance company to be deferred, all payments under the contract "must be part of a series of payment that begins within one year of the date of the initial investment in the contract."  60 Fed. Reg. 17731, 17733 (1995).  This regulation would limit the accumulation period for the Retirement CD to one year.

ADC and the banks which market the Retirement CD maintain that they were unaware of the regulations project until shortly before the Treasury Department published its proposed regulations.  During the second half of March, 1995, Donald E. Rocap of the law firm of Kirkland & Ellis contacted the

Insurance Branch of the Treasury Department on behalf of the plaintiffs.  He was told that his inquiry related to the interpretation of the Original Issue Discount ("OID") rules and that such issues would be overseen by the OID Branch.  He was given the names of individuals in that Branch, some of whom were working on the regulations project.  Malloy Aff. ¶ 18.  Those individuals do not recall ever having been contacted by Mr. Rocap.  *Id.*  A letter dated March 31, 1995 (six days before the April 6, 1995 Federal Register notice of the proposed regulations), was addressed to and received by the Insurance Branch from Mr. Rocap on behalf of ADC.  Attached to the letter was a memorandum of law concerning the tax treatment of accumulated interest on Retirement CD deposits.  *Id.*

As evidenced by the documents attached to the Affidavit of James F. Malloy, the insurance industry was well aware of the regulations project and submitted several legal memoranda addressing the proper tax treatment of the Retirement CD.  *See* Malloy Aff., Ex. F, G.  Mr. Malloy acknowledges that the regulations project staff met on at least two occasions with representatives of insurance industry groups to discuss the OID tax treatment of products such as the Retirement CD and that they never held similar meetings with plaintiffs.  He contends, however, that plaintiffs never requested any meeting and that, if they had, such a meeting would have been arranged.  Malloy Aff. ¶¶ 4, 17, 18.

On April 12, 1995, a member of the Treasury Department staff received a letter from Kenneth Anderson of the law firm Anderson, Aukamp & Gingold in which Mr. Anderson asserted that the law firm's efforts to discuss the proposed rules had been "summarily rejected."  On May 11, 1995, Mr. Malloy, members of his staff and a representative of the Tax Legislative Counsel's Office of the Treasury Department met with Mr. Anderson and representatives of plaintiffs ADC and FNB Santa Fe.  This meeting was arranged

---

**2.**  Dennis Gingold, one of the representatives of ADC, denies that he ever stated that the tax deferred feature of the Retirement CD had been approved by a private letter ruling of the IRS.

In any event, the veracity of the *New York Times* report does not bear on the motion before the Court.

because of the allegation that plaintiffs' efforts to discuss the proposed rule had been rejected prior to publication of the proposed rule. Mr. Malloy asserts that plaintiffs conceded at the meeting that they had not previously requested nor been denied a meeting. Malloy Aff. ¶ 21.

After being unable to secure an agreement from Mr. Malloy that the proposed regulations would be withdrawn, plaintiffs filed this lawsuit challenging the publication of the proposed regulations in the Federal Register. They allege that the proposed regulations are contrary to the language of the Internal Revenue Code and that the proposed retroactive application of the regulations would be unwarranted, arbitrary and capricious and a discriminatory exercise of the Secretary's power. Plaintiffs moved for preliminary injunctive relief and seek a declaratory judgment and a permanent injunction setting aside the proposed regulations, as well as an order enjoining this rulemaking proceeding and requiring the process to begin *de novo* with an opportunity for them to participate fully.

The Court heard argument on plaintiff's motion for preliminary injunction on June 7, 1995. Because the Court concludes that the case is not ripe for review, plaintiffs' motion for a preliminary injunction is denied and the case is dismissed.

## ANALYSIS

■ According to the traditional formulation for a preliminary injunction in this jurisdiction, a movant is entitled to injunctive relief upon a showing (1) that it has a likelihood of success on the merits; (2) that movant will suffer irreparable harm if the relief is denied; (3) that other interested parties will not suffer substantial harm if injunctive relief is granted; and (4) that the public interest favors the granting of relief or, at least, that the granting of relief is not adverse to the public interest. *National Wildlife Federation v. Burford,* 835 F.2d 305, 318–19 (D.C.Cir.1987); *Washington Metropolitan Area Transit Comm'n. v. Holiday Tours, Inc.,* 559 F.2d 841, 842–44 (D.C.Cir. 1977); *Virginia Petroleum Jobbers Ass'n. v. FPC,* 259 F.2d 921 (D.C.Cir.1958).

## A.  *Administrative Due Process Claim*

Plaintiffs seek preliminary injunctive relief because they contend that the mere publication of the proposed regulations immediately rendered the Retirement CD unmarketable; that the publication is resulting in irreparable injury to ADC, Blackfeet and FNB Santa Fe, and that there is a threat of future irreparable injury to plaintiffs; that there will be no countervailing injury to the Treasury Department if the injunction is imposed because depositors will obtain the desired tax deferral by purchasing insurance company annuities; that an injunction will serve the public interest because it will stop a rulemaking proceeding that is marked by a lack of administrative due process and fails to comply with Executive Order 12866; and that the proposed regulation is contrary to the language of the Internal Revenue Code.

■ Plaintiffs concede that an injunction in these circumstances may be unprecedented, but argue that an extraordinary situation demands an extraordinary response. They allege that the Retirement CD and Blackfeet National Bank were specifically targeted by representatives of the insurance industry during the period of the regulations project and that, unlike the insurance industry which participated extensively, plaintiffs were denied administrative due process because they were not permitted to participate in the prepublication regulations project. Plaintiffs contend that the affidavits and papers filed in support of the Secretary's opposition to the motion for preliminary injunction document extensive dealings between the Treasury Department and persons who wished to close down Blackfeet and stop sales of the Retirement CD, show that Treasury Department employees were instructed not to reveal the existence of the regulations project to anyone who was not already aware of it, and that the Treasury Department, although aware that ADC and Blackfeet were the specific targets of the regulations project, never made any effort to contact plaintiffs.

The Secretary responds that the regulations project was not a secret; its existence was published in the Federal Register and,

while its existence was not volunteered to anyone, it was not denied either. As to the participation of representatives of the insurance industry and the Treasury Department's failure to seek out the opinion of plaintiffs, defendant contends that the Treasury Department did not seek outside help from the insurance industry or anyone else either. Rather, any party that sought to participate was permitted to do so. Plaintiffs simply did not make any attempt to take part. According to Mr. Malloy, at least those representatives of plaintiffs, including Kenneth Anderson, who took part in a post-publication meeting between plaintiffs' representatives and Treasury Department staff conceded that they never requested an opportunity to speak or meet with Treasury Department staff regarding the regulations project. Malloy Aff. ¶ 21.[3]

■ "[I]nformal contact between agencies and the public are the 'bread and butter' of the process of administration and are completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 57 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *see Sierra Club v. Costle,* 657 F.2d 298, 400, 410 (D.C.Cir.1981). While it may have been impolitic for the Department of the Treasury not to invite a specific response by ADC or Blackfeet, especially in view of the fact that those entities were mentioned in memoranda provided by representatives of the insurance industry, that fact does not amount to a denial of administrative due process. *See Action for Children's Television v. FCC,* 564 F.2d 458, 473 (D.C.Cir. 1977). The Court is persuaded by defendant's arguments that plaintiffs had full access to the regulations project because of the notice published in the Federal Register in November of 1994 and the information given to Mr. Rocap when he contacted the Insurance Branch of the Treasury Department in March of 1995. Most importantly, plaintiffs now have a second opportunity to participate because of the pendency of a public comment period followed by a scheduled public hearing.

### B. Ripeness

■ On these facts, the defendant argues that the Court lacks jurisdiction to act on plaintiffs' complaint because the proposed regulations that have been published do not constitute "final agency action" within the meaning of the Administrative Procedures Act. *See* 5 U.S.C. § 704; *see Franklin v. Massachusetts,* —— U.S. ——, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). As a result, defendant contends that this case is not ripe for judicial resolution.

As the Supreme Court has stated, the rationale of the ripeness doctrine is:

> to prevent the Courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *see also Eagle–Picher Industries, Inc. v. United States EPA,* 759 F.2d 905, 912–13 (D.C.Cir.1985). The two-pronged test for ripeness established in *Abbott Laboratories* requires the Court to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court review. *Abbott Laboratories v. Gardner,* 387 U.S. at 149, 87 S.Ct. at 1516. *See Chamber of Commerce v. Reich,* 57 F.3d 1099, 1100 (D.C.Cir.1995). "[T]he [fitness variable functions] as a measure of the interests of the court and agency in postponing review and the [hardship variable functions] as a measure of the challenging party's countervailing interest in securing immediate judicial review." *Ciba–Geigy Corp. v. United*

---

**3.** Mr. Gingold, a partner in the same law firm as Mr. Anderson, asserts in his affidavit that "[o]n several occasions during the weeks prior to April 7, 1995, one of our counsel and I attempted to communicate with representatives of the Treasury Department and the Internal Revenue Service with respect to the Retirement CD, and to enquire [sic] whether any rulemaking or other action with respect to it was contemplated. On each occasion each of us was told 'I can't talk to you,' or words to that effect." Gingold Aff. ¶ 2.

*States EPA,* 801 F.2d 430, 434 (D.C.Cir. 1986). If the "interests of the court and agency in postponing review until the question arises in some more concrete and final form outweigh the interests of those seeking relief from the challenged action's 'immediate and practical impact' upon them," or when deferring consideration might eliminate the need for review altogether, then "settled principles of ripeness squarely call for adjudication to be postponed." *Mountain States Tel. and Tel. Co. v. FCC,* 939 F.2d 1021, 1029 (D.C.Cir.1991) (quotation omitted). *See Chamber of Commerce v. Reich,* 57 F.3d at 1100.

### 1. Fitness for Judicial Decision

■ While the underlying issue in this case is primarily a legal one and there therefore is no need for the Court to await a more concrete factual setting, deferring consideration in this case might, and likely will, eliminate the need for judicial review of the *proposed* regulations altogether. The Secretary of the Treasury intends to receive comments and hold a public hearing prior to the issuance of final regulations. Comments on the proposed regulations are due on or before July 18, 1995, and a public hearing is scheduled for August 8, 1995. Because the challenged regulations are not final, the Court risks judging the legality of *proposed* regulations and then having to re-examine the legality of *final* regulations which could be markedly different from the proposed regulations. While plaintiffs believe the cards are stacked against them, the fact is that the results of the public comment period and public hearing, with plaintiffs as full participants, could change the Secretary's view on the issues before him. Indeed, if the proposed regulations are so clearly inconsistent with the Internal Revenue Code as plaintiffs maintain, the Secretary inevitably will be persuaded and the proposed regulations will be modified. Thus, for the Court to defer decision until after a *final* agency decision will prevent it "from adjudicating matters that in fact make no difference and are a waste of our resources." *American Trucking Ass'ns, Inc. v. Interstate Commerce Comm'n,* 747 F.2d 787, 789–90 (D.C.Cir. 1984). Indeed, deferral "might eliminate the

need for review altogether." *Chamber of Commerce v. Reich,* 57 F.3d at 1100.

Plaintiffs counter that the Secretary's decision to issue proposed regulations in this case should be considered a sufficiently final decision upon which to conduct a review. They argue that the fact that the rule is a mere proposal is not determinative, and that the "finality" element of the ripeness doctrine should be evaluated in a flexible and pragmatic way. They rely on cases such as *Ciba–Geigy Corp. v. United States EPA,* 801 F.2d at 437, where the court found that a letter to Ciba–Geigy from EPA's Director of Pesticide Programs was a final decision because "the statement of position admit[s] of no ambiguity," required Ciba–Geigy's " 'immediate compliance,' " and was made by an official with the authority to speak for EPA. *Id. See also Mountain States Tel. and Tel. Co. v. FCC,* 939 F.2d at 1027–29; *TRT Telecommunications Corp. v. FCC,* 876 F.2d 134, 139–40 (D.C.Cir.1989); *Continental Air Lines v. C.A.B.,* 522 F.2d 107, 124–125 (D.C.Cir.1974). Despite plaintiffs' arguments, this is a very different case.

To be sure, publication of the proposed regulations is definitive on the question whether the Secretary of the Treasury has some reasons to conclude that products such as the Retirement CD do not fall within the exceptions to the OID rules governing taxation of accrued interest. But an agency action is not final if it is only tentative. *Franklin v. Massachusetts,* —— U.S. at ——, 112 S.Ct. at 2773, and there are many indications that so far there has merely been a "threshold determination that further inquiry is warranted and that [a notice of proposed rulemaking] should initiate proceedings." *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 241, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980); *see Public Citizen, Inc. v. United States Nuclear Regulatory Comm'n,* 940 F.2d 679, 682 (D.C.Cir.1991). For one thing, the proposed regulations do not purport to regulate current conduct by the parties. *See Abbott Laboratories v. Gardner,* 387 U.S. at 151, 87 S.Ct. at 1517; *see Action on Smoking and Health v. Department of Labor,* 28 F.3d 162, 165 (D.C.Cir.1994). Defendant's proposed regulations merely serve notice on the

public that the Department of Treasury is considering issuing regulations, invites public comments on the proposed regulations and announces that a public hearing will be held on the issue. Only after these procedures are completed will the agency issue final regulations. Thus, the proposed regulations "still present[ ] a moving target...." *Franklin v. Massachusetts,* — U.S. at —, 112 S.Ct. at 2774.

Plaintiffs have the same right as anyone else to submit written comments and to participate in the public hearing. If plaintiffs believe the *final* regulations are so inconsistent with the Internal Revenue Code as to be an unwarranted, arbitrary and capricious exercise of agency rulemaking power, then they may renew their challenge. Based on the fact that the proposed regulations are just that—proposed—the Court finds that there has been no final agency decision within the meaning of the APA. That being said, the issues in this case are not fit for judicial review.

### 2. Hardship to the Parties

Turning to the second prong of the *Abbott Laboratories* test, the Court must consider the "hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. at 149, 87 S.Ct. at 1515. Plaintiffs complain that the business of ADC has dried up and it is likely to go out of business, that Blackfeet and FNB Santa Fe have stopped receiving deposits into Retirement CD accounts and stopped permitting withdrawals, and that FNB Santa Fe has now "lost" the large sums of money it has spent promoting the Retirement CD. Plaintiffs warn of possible runs on the banks if consumers learn that the banks won't receive deposits into the CDs and won't return savings.

Despite plaintiffs' arguments, this is not a unique or unusual case. It is common for business and industry to be affected by the publication of proposed rules that, if made final, would hurt the business or industry. It is also common for such businesses and industries to be adversely and immediately affected by the mere publication of the proposal. The courts almost invariably conclude, however, that such adverse repercus-

sions are outweighed by a notice procedure that permits the public to know what sorts of regulations are being contemplated by an agency, what rationale the agency employs to justify its proposed rules and how the agency's proposals can be challenged. *See Batterton v. Marshall,* 648 F.2d 694, 703 (D.C.Cir.1980) (purposes of notice and comment period are "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies."); *Guardian Federal Sav. and Loan Ass'n v. Federal Sav. and Loan Ins. Corp.,* 589 F.2d 658, 662 (D.C.Cir.1978) (notice and comment procedure "assures that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions."). As plaintiffs themselves note, it would be virtually unprecedented for a court to set aside proposed regulations and not to permit the public comment period to go forward.

As discussed above, the proposed regulations are not definitive statements of defendant's position. Nor do they do not have the status of law or require anyone to comply with them in any manner. *See FTC v. Standard Oil Co. of California,* 449 U.S. at 239–40, 101 S.Ct. at 493; *Housing Study Group v. Kemp,* 736 F.Supp. 321, 331 (D.D.C.1990). The only legal effect of the regulations is to notify interested parties of their right to put forth their positions regarding the taxability of accrued interest on the Retirement CD. Although concededly there has been a reaction by the consuming public to the Secretary's preliminary views regarding that subject, this reaction is different in kind and in legal effect from the burden attending what heretofore has been considered final agency action. *See FTC v. Standard Oil Co. of California,* 449 U.S. at 242, 101 S.Ct. at 494; *see also id.* at 247–49, 101 S.Ct. at 497–98 (Stevens, J., concurring); *compare Ciba–Geigy v. United States EPA,* 801 F.2d at 438–39 *with New York Stock Exchange v. Bloom,* 562 F.2d 736, 741 (D.C.Cir.1977).

In stark contrast to the lack of legal effect imposed on plaintiffs by defendant's proposed regulations, the impact of judicial review at this early stage of an agency's rule-

making process is likely to interfere with the proper functioning of the agency and, if it becomes commonplace, would impose a heavy burden on the courts. *See FTC v. Standard Oil Co. of California,* 449 U.S. at 242–43, 101 S.Ct. at 494–95. Because plaintiffs have not satisfied either the fitness or the hardship prong of the *Abbott Laboratories* test, the Court finds that plaintiffs' complaint is not ripe for review and that plaintiffs' motion for preliminary injunction therefore must be denied. Accordingly, it is hereby

ORDERED that plaintiffs' motion for preliminary injunction is DENIED; and it is

FURTHER ORDERED that this case is DISMISSED in its entirety from the docket of the Court.

SO ORDERED.